UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RAVEN'S LANDING, LLC d/b/a DR. NATURE RX,
HEMPED NYC, LLC, HIDDEN HEMP CORP., HEMPED
NYC ON ORCHARD LLC, GASKO & MEYER INC.,
SARENE CRAFT BEER DISTRIBUTORS, LLC,
WINDY HILL 312 LLC d/b/a WINDY HILL CBD AND
WELLNESS, NORTH FORK DISTRIBUTION, INC.
d/b/a CYCLING FROG, THE GREEN ROOM, AND
REBEL RABBIT

                                                        Plaintiffs,


                        -against-                                           No. 24-cv-1874 (ER) (GWG)


NEW YORK STATE CANNABIS CONTROL
BOARD, NEW YORK STATE OFFICE OF
CANNABIS MANAGEMENT, TREMAINE WRIGHT,
in her official capacity as the Chairwoman of the New
York State Cannabis Control Board, and CHRIS
ALEXANDER, in his official capacity as Executive
Director of the New York State Office of Cannabis
Management,

                                                        Defendants.


**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS**



                                        LETITIA JAMES
                                        Attorney General
                                        State of New York
                                        *Attorney for Defendants*
                                        28 Liberty Street
                                        New York, NY 10005
                                        (212) 416-8508


Noam Lerer
Assistant Attorney General
Of Counsel

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

PRELIMINARY STATEMENT ......................................................................................... 1

STATEMENT OF FACTS................................................................................................... 3

    A.  Statutory Scheme ............................................................................................. 3

    B.  Cannabinoid Hemp Regulations and Prior Litigation................................. 7

    C.  Allegations Regarding Inspections at Issue in This Litigation .................. 11

    D.  Procedural History ........................................................................................ 12

ARGUMENT ..................................................................................................................... 12

    I. The Eleventh Amendment Bars All Claims against the Board and OCM and all Damages Claims against Wright and Alexander.......................................................................... 12

    II.  Plaintiffs Fail to State a Claim................................................................... 13

    A.  Plaintiffs' Takings Claim Fails ................................................................... 14

    B.  Plaintiffs' Due Process Challenge to the Regulations Fails...................... 20

    C.  Plaintiffs' Supremacy Clause Claim Fails ................................................. 25

    D.  Plaintiff's Fourth Amendment Claim Fails................................................ 29

    E.  Any Due Process Claim Relating to the Inspections Fail ......................... 38

    F.  Plaintiffs' Selective Enforcement Claim Fails........................................... 41

    G.  Plaintiffs' Conspiracy Claims Fail ............................................................. 43

CONCLUSION.................................................................................................................. 43

# TABLE OF AUTHORITIES

**CASES**

**Page(s)**

*1256 Hertel Ave. Assocs., LLC v. Calloway,*
    761 F.3d 252 (2d Cir. 2014) ........................................................................... 14, 16

*335-7 LLC v. City of N.Y.,*
    524 F. Supp. 3d 316 (S.D.N.Y. 2021) ............................................................. 16, 18

*74 Pinehurst LLC v. N.Y.,*
    59 F.4th 557 (2d Cir. 2023) ............................................................................ passim

*AK Indus. Hemp Ass'n, Inc. v. Alaska Dep't of Nat. Res.,*
    No. 23-CV-00253-SLG, 2023 WL 8935020 (D. Alaska Dec. 27, 2023) ............ 28

*Albright v. Oliver,*
    510 U.S. 266 (1994) ............................................................................................. 21

*Altria Grp., Inc. v. Good,*
    555 U.S. 70 (2008) ............................................................................................... 26

*Andrus v. Allard,*
    444 U.S. 51 (1979) ......................................................................................... 15, 18

*Anobile v. Pelligrino,*
    303 F.3d 107 (2d Cir. 2002) ........................................................................... passim

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ............................................................................................. 14

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) ............................................................................................. 14

*Bio-Gen, LLC v. Sanders,*
    No. 23-CV-00718-BRW, 2023 WL 5804185 (E.D. Ark. Sept. 7, 2023) .......... 26, 28, 29

*Blue v. Koren,*
    72 F.3d 1075 (2d Cir. 1995) ........................................................................... passim

*Brinkmeyer v. Washington State Liquor & Cannabis Bd.,*
    No. C20-5661 BHS, 2023 WL 1798173 (W.D. Wash. Feb. 7, 2023) ................ 31

*Bryant v. N.Y. State Educ. Dept.,*
    692 F.3d 202 (2d Cir. 2012) ................................................................................ 21

*Buffalo Tchrs. Fed'n v. Tobe,*
    464 F.3d 362 (2d Cir. 2006) .................................................................................. 15

*C.Y. Wholesale, Inc. v. Holcomb,*
    965 F.3d 541 (7th Cir. 2020) ........................................................................... 27, 28

*Cedar Point Nursery v. Hassid,*
    594 U.S. 139 (2021) ............................................................................ 14, 16, 17, 19

*Cmty. Hous. Improvement Program v. City of N.Y.,*
    59 F.4th 540 (2d Cir. 2023) ............................................................................ 14, 15, 21

*Cnty. of Sacramento v. Lewis,*
    523 U.S. 833 (1998) ............................................................................................... 22

*Colonnade Corp. v. United States,*
    397 U.S. 72 (1970) ........................................................................................... 30, 32

*Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.,*
    508 U.S. 602 (1993) ............................................................................................... 18

*Conn v. Gabbert,*
    526 U.S. 286 (1999) ............................................................................................... 23

*Conservation Force v. Salazar,*
    677 F. Supp. 2d 1203 (N.D. Cal. 2009) ................................................................ 38

*Culley v. Marshall,*
    144 S. Ct. 1142 (2024) .......................................................................................... 38

*Dava v. City of N.Y.,*
    No. 1:15-CV-08575 (ALC), 2016 WL 4532203 (S.D.N.Y. Aug. 29, 2016) ...................................... 42

*Dines v. Kelly,*
    No. 222CV02248KHVGEB, 2022 WL 16762903 (D. Kan. Nov. 8, 2022) .................................... 26

*Duke's Invs. LLC v. Char,*
    No. CV 22-00385 ................................................................................................... 27

*Edelhertz v. City of Middletown,*
    943 F. Supp. 2d 388 (S.D.N.Y. 2012) (Ramos, J.) .......................................... 20, 21

*Edelman v. Jordan,*
    415 U.S. 651 (1974) ............................................................................................... 13

*Everest Foods, Inc. v. Cuomo,*
    585 F. Supp. 3d 425 (S.D.N.Y. 2022) ....................................................... 16, 22, 23

*F.C.C. v. Beach Commc'ns, Inc.*,
   508 U.S. 307 (1993)...........................................................................................................25

*Free Spirit Organics, NAC v. San Joaquin Cnty. Bd. of Supervisors*,
   No. 17-CV-02271 (KJM) (JDP), 2022 WL 902834 (E.D. Cal. Mar. 25, 2022) .............................28

*Goe v. Zucker*,
   43 F.4th 19 (2d Cir. 2022)...............................................................................................22

*Grand River Enterprises Six Nations, Ltd. v. Boughton*,
   988 F.3d 114 (2d Cir. 2021) ......................................................................................... 23, 25

*Grant v. Am. Soc'y for the Prevention of Cruelty to Animals*,
   No. 16 CIV. 2765 (ER), 2017 WL 1229737 (S.D.N.Y. Mar. 31, 2017) ..................................... 38, 39

*Grullon v. Reid*,
   No. 97 CIV. 7616 (RWS), 1999 WL 436457 (S.D.N.Y. June 24, 1999)......................................41

*Hopkins Hawley LLC v. Cuomo*,
   518 F. Supp. 3d 705 (S.D.N.Y. 2021)..........................................................................20, 22, 23

*Horne v. Dep't of Agric.*,
   576 U.S. 350 (2015)...........................................................................................................15

*Hourihan v. Lafferty*,
   58 F. Supp. 2d 10 (N.D.N.Y. 1999) ...................................................................................39

*Hu v. City of N.Y.*,
   927 F.3d 81 (2d Cir. 2019) ......................................................................................... 23, 41

*Hudson v. Palmer*,
   468 U.S. 517 (1984)...........................................................................................................40

*Interport Pilots Agency, Inc. v. Sammis*,
   14 F.3d 133 (2d Cir. 1994) ...............................................................................................20

*Kaluczky v. City of White Plains*,
   57 F.3d 202 (2d Cir. 1995)................................................................................................21

*Karol v. City of N.Y.*,
   396 F. Supp. 3d 309 (S.D.N.Y. 2019)...................................................................................22

*Keitt v. City of N.Y.*,
   882 F. Supp. 2d 412 (S.D.N.Y. 2011)...................................................................................13

*Keystone Bituminous Coal Ass'n v. Benedictis*,
   480 U.S. 487 (1987)...........................................................................................................19

*Khoshneviss v. Prop. Clerk of New York City Police Dep't*,
    123 A.D.3d 929 (N.Y. App. Div. 2d Dep't 2014) ....................................................39

*Leebaert v. Harrington*,
    332 F.3d 134 (2d Cir. 2003) ......................................................................................22

*Lilakos v. N.Y. City*,
    808 F. App'x 4 (2d Cir. 2020) ..................................................................................42

*Lingle v. Chevron U.S.A., Inc.*,
    544 U.S. 528 (2005) ..................................................................................................16

*Lucas v. S.C. Coastal Council*,
    505 U.S. 1003 (1992) ................................................................................................16

*Malapanis v. Regan*,
    335 F. Supp. 2d 285 (D. Conn. 2004) ..........................................................38, 40, 41

*Maryland Shall Issue, Inc. v. Hogan*,
    963 F.3d 356 (4th Cir. 2020) ....................................................................................15

*Maryland v. Louisiana*,
    451 U.S. 725 (1981) ..................................................................................................26

*Meserole St. Recycling, Inc. v. City of N.Y.*,
    No. 06 CIV. 1773 (AKH), 2009 WL 10739210 (S.D.N.Y. Nov. 25, 2009) ...................31

*Mian v. Donaldson, Lufkin & Jenrette Securities Corp.*,
    7 F.3d 1085 (2d Cir. 1993) ........................................................................................43

*Michigan v. Summers*,
    452 U.S. 692 (1981) ..................................................................................................36

*Miller v. Bazan*,
    No. 5:13-CV-00993 BKS, 2015 WL 339533 (N.D.N.Y. Jan. 26, 2015) .....................41

*Molinari v. Bloomberg*,
    564 F.3d 587 (2d Cir. 2009) ......................................................................................22

*Moss v. Spitzer*,
    19 A.D.3d 599 (N.Y. App. Div. 2d Dep't 2005) .......................................................39

*Muehler v. Mena*,
    544 U.S. 93 (2005) ....................................................................................................36

*Murr v. Wisconsin*,
    582 U.S. 383 (2017) ..................................................................................................16

*N. Fork Distrib., Inc. v. N.Y. State Cannabis Control Bd.*,
    81 Misc. 3d 952 (N.Y. Sup. Ct. Albany Cnty. 2023) ........................................................8, 9

*N. Va. Hemp & Agric. LLC v. Va.*,
    No. 123-CV-1177LMBIDD, 2023 WL 7130853 (E.D. Va. Oct. 30, 2023) ......................26, 27, 28

*N.Y. Pet Welfare Ass'n, Inc. v. City of N.Y.*,
    850 F.3d 79 (2d Cir. 2017) ................................................................................26

*N.Y. State Office of Cannabis Mgmt. v. Tulley*,
    No. CV089825, Dkt No. 61, Slip Op. (N.Y. Sup. Ct. Wayne Cnty. Nov. 6, 2023) .......................30

*New Page at 63 Main, LLC v. Inc. Vill. of Sag Harbor*,
    No. 15-CV-2433 (ADS) (AKT), 2016 WL 8653493 (E.D.N.Y. Mar. 19, 2016).....................30, 42

*New York v. Burger*,
    482 U.S. 691 (1987)..................................................................................passim

*NRP Holdings LLC v. City of Buffalo*,
    916 F.3d 177 (2d Cir. 2019)................................................................................42

*Olsen v. Doldo*,
    No. 16-CV-5366 (RA), 2017 WL 1422431 (S.D.N.Y. Apr. 20, 2017)................................26

*Our Wicked Lady, LLC v. Cuomo*,
    No. 21-cv-0165 (DLC), 2021 WL 915033 (S.D.N.Y. Mar. 9, 2021).............................15, 17, 21, 23

*Papasan v. Allain*,
    478 U.S. 265 (1986)..................................................................................13

*Park Ave. Tower Assocs. v. City of N.Y.*,
    746 F.2d 135 (2d Cir. 1984)................................................................................18

*Penn Central Transportation Co. v. N.Y. City*,
    438 U.S. 104 (1978)..................................................................................17, 19

*Pennhurst State Sch. & Hosp. v. Halderman*,
    465 U.S. 89 (1984)..................................................................................13

*Pennsylvania Coal Co. v. Mahon*,
    260 U.S. 393 (1992)..................................................................................16

*Perkins v. City of W. Covina*,
    113 F.3d 1004 (9th Cir. 1997) ................................................................................39

*Players, Inc. v. City of N.Y.*,
    371 F. Supp. 2d 522 (S.D.N.Y. 2005)..................................................31, 32, 33, 37

*Ruston v. Town Bd. for Town of Skaneateles*,
    610 F.3d 55 (2d Cir. 2010) ................................................................................................42

*Sadowsky v. N.Y.*,
    732 F.2d 312 (2d Cir. 1984) ..............................................................................................18

*Sensational Smiles, LLC v. Mullen*,
    793 F.3d 281 (2d Cir. 2015) ..............................................................................................22

*Serna v. Denver Police Dep't*,
    58 F.4th 1167 (10th Cir. 2023) ..........................................................................................26

*Shaul v. Cherry Valley-Springfield Cent. Sch. Dist.*,
    363 F.3d 177 (2d Cir. 2004) ..............................................................................................38

*Sherman v. Town of Chester*,
    752 F.3d 554 (2d Cir. 2014) ..............................................................................................16

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*,
    535 U.S. 302 (2002) ..........................................................................................................14

*United States v. 4,432 Mastercases of Cigarettes, More Or Less*,
    448 F.3d 1168 (9th Cir. 2006) ...........................................................................................37

*United States v. Biswell*,
    406 U.S. 311 (1972) ..........................................................................................................33

*United States v. Funaro*,
    253 F. Supp. 2d 286 (D. Conn. 2003) ...............................................................................33

*United States v. Hamad*,
    809 F.3d 898 (7th Cir. 2016) .............................................................................................31

*United States v. Maggio*,
    51 F.2d 397 (W.D.N.Y. 1931) ...........................................................................................38

*United States v. Mansour*,
    252 F. Supp. 3d 182 (W.D.N.Y. 2017) ...................................................................31, 32, 33

*United States v. Salerno*,
    481 U.S. 739 (1987) ..........................................................................................................20

*United States v. Sorcher*,
    No. 05-CV-0799 (NG) (RLM), 2007 WL 1160099 (E.D.N.Y. Apr. 18, 2007) ...................31, 33

*Vartholomeou v. City of New York*,
    No. 15 CV 4996 (PKC)(LB), 2018 WL 11466965 (E.D.N.Y. Jan. 2, 2018) ....................40

*Virgilio v. City of N.Y.*,
    407 F.3d 105 (2d Cir. 2005) ................................................................................ 14

*Wachovia Bank, N.A. v. Burke*,
    414 F.3d 305 (2d Cir. 2005) ................................................................................ 26

*Will v. Mich. Dept. of State Police*,
    491 U.S. 58 (1989) ................................................................................................ 13

*Witt v. Vill. of Mamaroneck*,
    No. 12-CV-8778 ER, 2015 WL 1427206 (S.D.N.Y. Mar. 27, 2015 .......................... 41

*Wyeth v. Levine*,
    555 U.S. 555 (2009) .............................................................................................. 26

*Yee v. City of Escondido, Cal.*,
    503 U.S. 519 (1992) .............................................................................................. 15

## Constitutional Provisions

U.S. Const. amend. V ........................................................................................................ 14

U.S. Const. amend. XIV
    § 1 ....................................................................................................................... 14

## Federal Statutes

7 U.S.C.
    § 1639p ............................................................................................................ 4, 27

7 USCA
    § 1639o ................................................................................................................... 3

Agricultural Act of 2014, Pub. L. No. 113-79, 128 Stat. 649 (2014) ..................................... 3

Agriculture Improvement Act of 2018, Pub. L. No. 115-334, 132 Stat. 4490 ("Farm
    Act" or "Farm Law")
        § 10113 ...................................................................................... 3-4, 12, 27-28
        § 1639o ......................................................................................... 4, 24-26

**STATE STATUTES**

2021 Sess. Law N.Y. Ch. 92 ("MRTA") § 2 ("Original Cannabis Law")

    § 10(8) ..............................................................................................................6
    § 11 ...........................................................................................................4, 34
    § 91 ...........................................................................................................5, 24
    § 104(3) ..........................................................................................................5
    § 104(4) ..........................................................................................................5

2023 Sess. Laws of N.Y. c. 56, p. UU .........................................................................7

2024 Sess. Laws of N.Y. Ch. 55 Part G.......................................................................8

Cannabis Law

    § 10 ..................................................................................................................7
    § 11 ....................................................................................................7, 37 37
    § 63 ................................................................................................................32
    § 96 ................................................................................................................32
    § 103 ..............................................................................................................35
    § 138-a........................................................................................................7, 35

N.Y. Tax Law

    Article 20-B ................................................................................................32
    Article 28 ...............................................................................................25, 32
    § 493(a) ........................................................................................................25

**STATE REGULATIONS**

9 NYCRR 114.1 ...........................................................................................................8

9 NYCRR 114.8 ..................................................................................................passim

9 NYCRR 114.9 ...........................................................................................................9

9 NYCRR 114.11 .................................................................................................6-7, 37

9 NYCRR 114.14(f) .............................................................................................27, 28

9 NYCRR 114.21(b) ....................................................................................................9

9 NYCRR 133.3 .......................................................................................6, 7, 37, 40

9 NYCRR 133.4 ...........................................................................................................7

Defendants the New York State Cannabis Control Board ("Board"), the New York State Office of Cannabis Management ("OCM"), Tremaine Wright, in her official capacity as the Chairwoman of the Board, and Felicia A.B. Reid, in her official capacity as OCM Acting Executive Director, respectfully submit this memorandum of law in support of their motion to dismiss the complaint.[1]

## PRELIMINARY STATEMENT

The legal New York cannabis and "cannabinoid hemp" industries are in their infancy. The relevant statute allowing their creation passed barely three years ago. The New York State Cannabis Law ("Cannabis Law" or "NYCL") was supposed to create a licensing and regulatory regime meant to ensure the formation of a safe, regulated industry that consumers could trust. To that end, the Legislature vested the implementing regulator, OCM/the Board, with the power to enforce the law and ensure the public's wellbeing. And as with every such legislative grant of authority, the Legislature provided the Board and OCM the power to promulgate necessary regulations to carry out the intent of the Legislature set forth in the Cannabis Law. At issue in this matter are regulations at the very core of OCM's mission: the ability to inspect cannabinoid hemp products and regulate their quality and content in order to ensure consumer safety. The importance and necessity of building and maintaining an effective inspection scheme is even more crucial given that this nascent industry is being built from the ground up, necessitating close monitoring to ensure public safety.

To fulfill this legislative mandate, OCM established an enforcement apparatus, which three of the Plaintiffs now challenge after being subject to inspection—and its attendant consequences for failure to obey the law. Like inspections in countless areas ranging from liquor, to firearms, to racing, to cigarettes, these inspections were conducted as regulatory inspections, which did not require a

---

[1] Felicia A.B. Reid has replaced Chris Alexander as Executive Director of OCM and is therefore automatically substituted as an official capacity defendant pursuant to Fed. R. Civ. P. 25(d). Defendants therefore request that the Court order that the caption be changed accordingly.

warrant, rather than as criminal searches, which usually do.

      The Board and OCM also took action to close a significant regulatory loophole. The federal government had legalized industrial "hemp," defined in a way that was clearly supposed to include products that were non-intoxicating. The definition of "hemp," however, was based on the dry-weight percentage of a certain THC analogue, and clever businesses soon moved into the area and created products that technically qualified as "hemp" but were intoxicating like cannabis. To close that loophole, the Board promulgated emergency regulations under the State Administrative Procedure Act ("SAPA") further regulating the content of cannabinoid hemp products, pending the completion of a normal notice and comment rulemaking process. After a group of plaintiffs, which overlaps with Plaintiffs here, disagreed with this invocation of emergency powers and filed suit, the emergency regulations were enjoined on purely state procedural grounds. The Board then promulgated permanent cannabinoid hemp regulations using the regular rulemaking process (the "Regulations"). After an over three-month hiatus, however, Plaintiffs again brought suit, this time challenging the Regulations as barred by the Takings Clause, the Due Process Clause, and later on, by the Supremacy Clause. On behalf of three Plaintiffs who were subject to regulatory inspections, they also brought a Fourth Amendment claim premised on the idea that cannabis regulators, alone among regulators in similarly closely regulated industries, can only inspect premises and seize contraband pursuant to a warrant, and what appears to be a selective enforcement claim. Despite waiting over three months from the promulgation of the Regulations, and nearly a year from the first search, Plaintiffs sought a preliminary injunction, which this Court denied at oral argument.

      Plaintiffs' complaint must be dismissed for substantially the same reason they failed to show a substantial likelihood of success on the merits at the preliminary injunction stage. They have come nowhere near to alleging that a regulation with a modest impact on their *businesses* constitutes a regulatory taking of their *property*. Likewise, their procedural due process claim fails because such a

claim does not lie to challenge a rulemaking. Plaintiffs' substantive due process claim also fails because such a claim does not lie where a Takings Claim has been made, and in any event, the Regulations' clear purpose of closing a regulatory loophole and protecting health is abundantly rational. Plaintiffs' belated and unpled Supremacy Clause claim fails because the federal government unmistakably allowed the states to make more stringent regulations of hemp than the federal government does. And their Fourth Amendment claim fails because the acts at issue were appropriate regulatory inspections pursuant to *New York v. Burger,* 482 U.S. 691 (1987). Finally, Plaintiffs' procedural due process challenge to the retention of the seized items, raised clearly for the first time at oral argument, fails because even assuming *arguendo* that Defendants mistakenly retained items that were not in fact contraband, the continued retention of those items is contrary to OCM policy as evinced by its regulations, and accordingly, any due process claim is eliminated by the existence of a post-deprivation remedy under CPLR Article 78.

## STATEMENT OF FACTS

### A. Statutory Scheme

The legal "cannabinoid hemp" industry began less than five and a half years ago on December 20, 2018, when Congress passed a bill that *inter alia* exempted "hemp" from the Controlled Substances Act, which was defined as "the plant Cannabis sativa L. and any part of that plant . . . with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis." Agriculture Improvement Act of 2018, Pub. L. No. 115-334, 132 Stat. 4490 ("Farm Bill" or "Farm Act"), § 10113 (codified at 7 USCA § 1639o), 12619 (2018).[2] The act also allowed states "desiring to have primary regulatory authority over the production of hemp in the State" to submit a plan to the Secretary of

---

[2] A February 2014 bill permitted institutions of higher education or state departments of agriculture to grow or cultivate "industrial hemp" under certain circumstances, but the scope of that bill was too narrow to be directly relevant to the Plaintiffs here. Agricultural Act of 2014, Pub. L. No. 113-79, 128 Stat. 649 (2014).

Agriculture subject to certain minimum requirements for that plan. *Id.* at § 10113.[3]

Congress chose to preempt all state laws in one narrow area, providing that "No State . . . shall prohibit the transportation or shipment of hemp or hemp products produced in accordance with [federal law] through the State . . . ." *Id.* at § 10114. The act otherwise explicitly preserved States' ability to regulate hemp within their own borders:

> (A) NO PREEMPTION.—Nothing in this subsection preempts or
> limits any law of a State or Indian tribe that—
> (i) regulates the production of hemp; and
> (ii) is more stringent than this subtitle.

*Id.* at § 10113 (codified at 7 U.S.C. § 1639p).

On March 31, 2021, New York State passed the Marihuana Regulation and Taxation Act, 2021 Sess. Law N.Y. Ch. 92 ("MRTA"). The MRTA legalized cannabis and also established the Board and OCM to create a regulatory regime that would allow cannabis to be produced and sold in an orderly fashion, subject to various requirements ranging from licensing, labelling, and testing among many others. *See generally id.* § 2 ("Original Cannabis Law") at Article 2 (New York State Cannabis Control Board); Article 3 (Medical Cannabis); Article 4 (Adult-Use Cannabis); Article 6 (General Provisions). The MRTA also empowered the Board and OCM to create a regulatory regime for "cannabinoid hemp," which broadly mirrored the federal definition of hemp, except that it provided that the product "shall not have a concentration of more than three tenths of a percent delta–9 tetrahydrocannabinol" without specifying that this concentration was only on a dry weight basis. *Id.* § 3(3) & 27-28 (definitions), § 10 (Board powers); § 11 (OCM powers); Article 5 (cannabinoid hemp and hemp extract). The Cannabis Law then and now provided the Board the:

> ability to regulate excipients, and the types, forms, and concentration
> of products which may be manufactured and/or processed, in order
> to ensure the health and safety of the public and the use of proper

---

[3] New York has such an approved plan in place. *See* Status of State and Tribal Hemp Production Plans for USDA Approval, www.ams.usda.gov/rules-regulations/hemp/state-and-tribal-plan-review (last visited June 18, 2024)

> ingredients and methods in the manufacture of all medical, adult-use,
> cannabinoid hemp and hemp extract to be sold or consumed in the
> state and to ensure that products are not packaged, marketed, or
> otherwise sold in a way which targets minors or promotes increased
> use or cannabis use disorders.

*Id.* § 10(4); NYCL § 10(4).  The Cannabis Law provides the Board with rulemaking authority "for the

processing, distribution, marketing, transportation and sale of cannabinoid hemp and hemp extracts

used for human consumption," including "[m]ethods and standards of processing, labeling, packaging

and marketing" and "[p]rocedures for how cannabinoid hemp, hemp extract or ingredients, additives,

or products derived therefrom can be deemed as acceptable for sale in the state."  Original Cannabis

Law § 91; *see also* NYCL § 91 (substantively similar language).  Notably, the MRTA put market entrants

on notice from the very beginning that the regulations for cannabinoid hemp could be more stringent

than the federal definition:

> All cannabinoid hemp, hemp extract and products derived therefrom
> used for human consumption shall be extracted and processed in
> accordance with good manufacturing processes pursuant to Part 117
> or Part 111 of title 21 of the code of federal regulations, ***as may be
> defined, modified and decided upon by the board in rules or
> regulations.***

Original Cannabis Law § 104(3) (emphasis added); NYCL § 104(3) (unchanged); *see also* Original

Cannabis Law § 104(4) ("As necessary to protect human health, the board shall have the authority to:

(a) regulate and prohibit specific ingredients, excipients or methods used in processing cannabinoid

hemp, hemp extract and products derived therefrom; and (b) prohibit, or expressly allow, certain

products or product classes derived from cannabinoid hemp or hemp extract, to be processed.");

NYCL § 104(4) (unchanged).

The MRTA, from the beginning, also provided a comprehensive inspection regime to enforce

its own requirements and any later regulatory requirements.  The Board was given the power "[t]o

inspect or provide authorization for the inspection at any time of any premises where medical

cannabis, adult-use cannabis or cannabinoid hemp and hemp extract is cultivated, processed, stored,

distributed or sold," Original Cannabis Law § 10(8), and OCM was given similar powers. *Id.* § 11(3), (5). The law also specifically provided that "[t]he packaging, sale, or possession of products derived from cannabinoid hemp or hemp extract used for human consumption not labeled or offered in conformity with regulations under this section shall be grounds *for the seizure* or quarantine of the product, the imposition of a civil penalty against a processor or retailer, and the suspension, revocation or cancellation of a license, in accordance with this article." *Id.* § 103(3) (emphasis added).[4]

On or about November 22, 2022, the Board passed regulations further delineating the inspection and seizure regime, by providing *inter alia*: "The Office [OCM] may conduct inspections or investigations of the licensee and any premises licensed by the Board . . . without prior notice," in a process that "may include interviews of [relevant] individuals" and stating that "Submission of an application for a license, issuance of a license, or permit to a licensee, constitutes consent for an inspection." 9 NYCRR 133.3(a) (promulgated Nov. 22, 2022). The regulations also provided a procedure relating to seizures of product, stating:

> any items containing cannabis or cannabis products which are in violation of the Cannabis Law or its applicable regulations may be seized and a stop order issued provided that:
> (1) a licensee shall be notified of the seizure;
> (2) a signed receipt shall be issued which states the items seized, their approximate weight, quantity and physical description;
> (3) the Office shall maintain documentation of the chain of custody of seized items; and
> (4) upon determination that the detention of the items seized are no longer necessary to ensure compliance with applicable regulations, the licensee shall be notified of that determination and the items may be returned to the licensee. The licensee shall acknowledge, in writing, receipt of the seized items at the time of such return.

*Id.* 133.3(f) (Nov. 22, 2022). While additions and changes have been made to section 133.3, the core provisions relevant to Plaintiffs are substantively unchanged, with the exception that the seizure

---

[4] This power was also reflected in implementing regulations regarding inspections of cannabinoid hemp retailers. 9 NYCRR 114.11 (effective Nov. 14, 2021 to July 26, 2023).

procedure, now included in Section 133.3(i), now explicitly also applies to cannabinoid hemp.  *See* 9 NYCRR 133.3; *see also* 9 NYCRR 114.11(f) ("The office may inspect any retail location offering cannabinoid hemp products.") (subsection (f) is unchanged from November 2021); *see also* 9 NYCRR 133.4(c) ("In response to a violation of any provision of the Cannabis Law and other related regulations, the office is authorized to take enforcement action or impose sanctions upon a licensee, registrant, or permittee. Sanctions may include, but are not limited to. . . seizure or quarantine of product. . . .").[5]

Amendments in May 3, 2023 added further refinements to Defendants' authority regarding the time and place of inspections and explicitly authorized the seizures of "any cannabis, cannabis product, cannabinoid hemp or hemp extract product, or any product marketed or labeled as such" of "any person who is unlawfully cultivating, processing, distributing or selling cannabis, cannabis product, cannabinoid hemp or hemp extract product, or any product marketed or labeled as such in this state without obtaining the appropriate registration, license, or permit therefor, or engaging in an indirect retail sale."  2023 Sess. Laws of N.Y. c. 56, p. UU, §§ 9-10 (amending Cannabis Law §§ 10(8), 11(3) & (5), and 138-a).[6]

## B. Cannabinoid Hemp Regulations and Prior Litigation

The first regulations regarding cannabinoid hemp were promulgated effective November 24, 2021 (and amended in September 2022) at 9 NYCRR Part 114.  Those regulations put current and potential market participants on explicit notice that future regulations might be more stringent than the federal definition of "hemp."  Most notably, the regulations explicitly stated: "the office may through future regulation *impose a total THC cap* for the purpose of protecting public health, which

---

[5] The complaint also indicates that these seizure procedures were applied to cannabinoid hemp even before the current amendment.  *See, e.g.,* Compl. ¶ 82 ("Defendants provided Mr. Kampf an inventory of seized products.").

[6] Additional changes to the Cannabis Law were promulgated in 2024 Sess. Laws of N.Y. Ch. 55 Part G.  While changes were made to certain language and statutory provisions, OCM's core authority as relevant to Plaintiffs here remains materially the same.

shall include detectable levels of total Δ9-Tetrahydrocannabinol, Δ8-Tetrahydrocannabinol and Δ10-Tetrahydrocannabinol in milligrams per serving and milligrams per package for cannabinoid hemp products *based on the product form, volume, number of servings, and ratio of CBD to THC*."  9 NYCRR 114.8 (effective Nov. 21, 2021 to Oct. 4, 2022) (emphasis added).

On July 19, 2023, the Board approved emergency regulations that followed through on this statement, imposing, *inter alia*, a CBD to THC ratio cap, a total THC cap and cannabinoid cap for orally consumed cannabinoid hemp products, and packaging and labelling requirements.  9 NYCRR 114.1 (definitions), 114.8 (product requirements), 114.9 (packaging and labeling requirements) (effective July 27, 2023) (the "Emergency Regulations").  A set of entities significantly overlapping with Plaintiffs here (North Fork Distribution, and Sarene Craft Beer Distributors) filed suit in state court under Article 78 of the state Civil Practice Law and Rules ("CPLR").  On November 9, 2023, the Court issued a preliminary injunction against the Emergency Regulations on the narrow basis that the emergency justification used by the Board was not sufficient to permit the use of emergency rulemaking—as opposed to regular notice and comment making—pursuant to SAPA.  *N. Fork Distrib., Inc. v. N.Y. State Cannabis Control Bd.*, 81 Misc. 3d 952, 960-64 (N.Y. Sup. Ct. Albany Cnty. 2023).  The Court noted that its review specifically concerned whether there was "substantial compliance" with SAPA.  *See id.* at 960.  It stated: "Here, the question is not whether respondents have the power to adopt regulations governing hemp infused products – they do.  Rather, the question is whether respondents followed the correct procedure for enacting the Emergency Regulations."  *Id.* at 958.  It further acknowledged that the case "involves the proliferation of a self-administered brain altering drug sold as a therapeutic to a vulnerable population.  The court fully grasps the emergent threat such products pose and respondents' need to ensure that such products are safely consumed." *Id.* at 964.

Eight days later, on November 17, 2023, the Board, pursuant to regular order notice and

comment rulemaking, approved the permanent cannabinoid hemp Regulations currently at issue in this lawsuit.[7]  The Regulations became effective December 13, 2023.  45 NY Reg 1.[8]  The Regulations "establish a new combined CBD and THC ratio, which is CBD dominate[d], for CBD and THC amounts permitted in cannabinoid hemp products not including flower products or topical products (not orally consumed) [of 15:1]; restrict the total amount of THC to 10 milligrams per package and 1 milligram per-serving size if the cannabinoid hemp product is orally consumed; add new rules for packaging certain cannabinoid hemp products, such as the use of resealable packages; and clarify the requirements that apply to inhalation and vaporization products."  *Id.* (discussing changes to 9 NYCRR 114.8).[9]

The primary reason for this rule, included in the accompanying Revised Regulatory Impact Statement ("RIS"), was that the Farm Bill's: "weight-based concentration limit . . . has not been sufficient to restrict the development and sale of new products with intoxicating levels of THC."  *Id.* at RIS.  In other words, while the original state regulatory scheme entailed a regulatory scheme for intoxicating products (cannabis), with attendant regulatory safeguards, and non-intoxicating products (cannabinoid hemp), recent market entrants had begun to produce products that were technically "hemp" under the Farm Bill but were nevertheless intoxicating like the cannabis products that continue to be federally prohibited.

The RIS went on to explain that in deciding how to address this issue: "the Office [*i.e.* OCM]

---

[7] Resolution Directing the Office of Cannabis Management to File for Adoption Certain Amendments to Cannabinoid Hemp Regulations, No. 2023-42 (Nov. 17, 23), https://cannabis.ny.gov/system/files/documents/2023/11/ccb-resolution-2023-42.pdf (last visited June 18, 2024).

[8] *Available from* Westlaw *at* 2023 NY REG TEXT 649285 (NS) (first and second link).  The effective date of certain labelling and advertising guidelines was set at January 1, 2024.  *See id.* ("Considerations for the concerns of businesses are reflected in the regulations by way of implementation timeframes for labeling. . . ."); 9 NYCRR 114.21(b).

[9] The Regulations also created expanded packaging and labelling requirements and adjusted testing standards.  *Id.* (discussing changes to 9 NYCRR 114.9 and 114.10).  While Plaintiffs note these additional changes in their complaint, Compl. ¶¶ 55, 57, their complaint does not clearly ask for these provisions to be struck down.  Moreover, Plaintiffs' PI Memo was silent on both provisions.  *See generally* ECF No. 16.

completed a regulatory analysis of the eight states with THC limits imposed on cannabinoid hemp products, the available peer reviewed literature, and task force recommendations from three states that convened task forces, as well as analyzed numerous studies to determine an appropriate level of THC in cannabinoid hemp products." *Id.* The analysis uncovered evidence that, if anything, would have justified a regulation more restrictive than the 15:1 ratios and 10 mg per package limits:

- Three (3) studies have found that the concentration of 2.5 mg of THC is the point where intoxicating effects on an average healthy adult begin to be detected;
- 5 mg of THC is considered the standard dose that causes impairment;
- The Cannabis Regulators Association (CANNRA) has indicated that limiting THC as mg per serving is more effective than percentage-based limits as the latter creates variation in allowable amounts based on the weight of inactive ingredients in the cannabinoid hemp product;
- One (1) state (Vermont) has enacted a minimum ratio requirement of CBD to THC of 20:1 in combination with a THC limit per serving for specific cannabinoid hemp product forms; and
- Colorado regulations employ a recommended THC limit of 2.5 mg per serving of cannabinoid hemp products in combination with a 15:1 CBD:THC ratio.

*Id.* Finally, the Summary of Assessment of Public Comment ("Assessment") noted that while some commentators wrote to "suggest[] other CBD to THC ratios" and "increasing the THC limits for cannabinoid hemp beverages," OCM had concluded that "intoxicating cannabinoid hemp products are better suited for the Adult-Use Cannabis Program where additional safeguards are in place to prevent youth and adolescent use and to protect public health, safety, and welfare of consumers in New York State," and reiterated that the Regulations' limits had been based on "numerous studies" and a "regulatory analysis." *Id.* The Assessment concluded that "The Office will continue to monitor safety data concerning CBD, with a commitment to improving our regulatory framework. . . . [T]he Office may consider guidance to clarify any discrepancies in the regulation and continue safety data monitoring to improve the proposed regulatory framework." In other words, the Regulations' limits were based on the best information available to OCM at the time; if the data changed, so would the regulations. *See also* Full Assessment of Public Comment, Amendments to Cannabinoid Hemp

Regulations: Part 114, hemp-part-114-apc-clean-adopt.pdf (ny.gov) (last visited June 18, 2024).

### C. Allegations Regarding Inspections at Issue in This Litigation

Plaintiffs have put at issue five searches allegedly conducted by OCM: two of Windy Hill, two of the Green Room, and one of Hidden Hemp.[10]  Plaintiffs admit that these searches were of the commercial premises of licensed entities:  Compl. ¶ 2 (alleging that Plaintiffs are all part of the "hemp-infused products" industry);  Compl. ¶¶ 70-118, 145-55 (allegations indicating that the inspections and seizures in question were of premises within that industry).

Plaintiffs admit being aware that they were the subjects of "an inspection."  Compl. ¶¶ 74 ("Defendants then stated that they need to conduct an inspection" of Hidden Hemp's Headquarters); Compl. ¶¶ 102-03 (referring to individuals who searched the Green Room as "inspector[s]"); Compl. ¶ 146 ("Defendants, through their employees, agents, or representatives conducted two inspections at Windy Hill").  Although Plaintiffs allege that self-declared New York Police Department officers participated in the search of Hidden Hemp, Compl. ¶ 159, nowhere do Plaintiffs allege that (1) they were informed they were under criminal investigation; (2) that anyone associated with Plaintiffs was charged with a crime; or (3) that anyone associated with Plaintiffs was even formally arrested.

By Plaintiffs' own account, no products were seized from Windy Hill.  Compl. ¶¶ 145-154. Plaintiffs do allege that products were seized during both Green Room inspections and the Hidden Hemp inspection and that formal inventory lists were provided in relation to at least two seizures. Compl. ¶¶  82-83, 104-111.  Notably, Plaintiffs' own account indicates that some of the products seized in at least the second Green Room inspection were illegal: Plaintiffs allege that "Delta-8" and "pre-rolls" were seized.  Compl. ¶ 111.  But only Delta-9 THC products constitute hemp under the

---

[10] For purposes of this motion to dismiss, Defendants rely strictly on the contents of the complaint and the applicable statutes and regulations, rather than the evidence contained in Defendants' declarations submitted in opposition to the motion for preliminary injunction.  Defendants similarly assume as true for purposes of this motion that OCM conducted all five inspections.

Farm Act or cannabinoid hemp under the Cannabis Law, subject to those laws' limitations.  Farm Law § 10113, NYCL § 3(3).  And the distribution or sale of pre-rolls has been consistently barred under 9 NYCRR 114.8 since its inception in 2021.

Plaintiffs also allege that the seized product has not been returned.  Plaintiffs, however, do not allege that they have instituted any formal proceedings to seek their return, such as filing proceedings under CPLR Article 78.

### D.  Procedural History

As noted above, the Regulations were approved November 17, 2023.  Despite the fact that Plaintiffs—two of whom had participated in the *North Fork* state court proceeding mentioned in this memorandum—must have been aware of this approval, they waited over three and a half months before filing suit in this Court on March 1, 2024.  24-cv-01581.  Moreover, the first inspection Plaintiffs complain of allegedly took place nearly one year earlier on March 22, 2023.  Compl. ¶ 73. Plaintiffs' first case was dismissed *sua sponte* by this Court (Vyskocil, J.), on March 11, 2024 on the grounds that it had been improperly commenced.  24-cv-01581, ECF No. 27 at 2-3.  The Court also raised "concerns that this action may be a state court action improperly dressed up as federal constitutional claims."  *Id.* at 2.  Undeterred, Plaintiffs commenced the current action the next day. ECF 1.

Plaintiffs then sought a preliminary injunction on March 18, 2024.  ECF 16.  After full briefing, the Court denied Plaintiffs' motion at a May 9, 2024 hearing.  *See* May 9, 2024 Transcript, ECF No. 45 ("Tr.").

### ARGUMENT

### I.  The Eleventh Amendment Bars All Claims against the Board and OCM and all Damages Claims against Wright and Alexander

The Eleventh Amendment bars all claims against the Board and OCM.  The Eleventh Amendment prevents a federal court from hearing a suit against a state or its agencies absent consent

or express abrogation by Congress. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 (1984). This bar applies whether the relief sought is legal or equitable in nature. *Papasan v. Allain*, 478 U.S. 265, 276 (1986). Congress did not abrogate the States' sovereign immunity when it enacted 42 U.S.C. §§ 1983 or 1985, and New York has not waived its immunity. *Keitt v. City of N.Y.*, 882 F. Supp. 2d 412, 447 (S.D.N.Y. 2011) (§§ 1983 and 1985). Moreover, state agencies are not "persons" for the purposes of § 1983. *Will v. Mich. Dept. of State Police*, 491 U.S. 58 (1989). Accordingly, all of Plaintiffs' claims against the Board and OCM are barred.[11]

This still leaves Plaintiffs' claims against Defendants Wright and Alexander, both sued in their official capacity. While Plaintiffs' claims for injunctive and declaratory relief can continue against them under the doctrine of *Ex Parte Young*, Plaintiffs' damages claims cannot. The Eleventh Amendment bars the award of compensatory damages from an official capacity defendant. *Papasan*, 478 U.S. at 278 ("Relief that in essence serves to compensate a party injured in the past by an action of a state official in his official capacity that was illegal under federal law is barred even when the state official is the named defendant."). This holds true even if the award is framed as equitable relief. *See Edelman v. Jordan*, 415 U.S. 651, 666 (1974) ("We do not read Ex parte Young or subsequent holdings of this Court to indicate that any form of relief may be awarded against a state officer, no matter how closely it may in practice resemble a money judgment payable out of the state treasury, so long as the relief may be labeled 'equitable' in nature."). Moreover, Section 1983 also does not allow damages claims against state officials sued in their official capacity. *Will*, 491 U.S. at 71. Accordingly, Plaintiffs' damages claims must also be dismissed.

## II.  Plaintiffs Fail to State a Claim

Under Rule 12(b)(6), a complaint must be dismissed "if there are no legal grounds upon which

---

[11] This fatal flaw also dispenses with Plaintiffs' fifth cause of action, which is for "deliberate indifference and/or failure to train" rather than for a specific separate alleged constitutional violation. This cause of action is at most an attempt to invoke the *Monell* doctrine of municipal liability, which has no application to state agencies.

relief may be granted." *Virgilio v. City of N.Y.*, 407 F.3d 105, 111 (2d Cir. 2005).  To "survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557, (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  This standard is not met, however, by "recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.*  Plaintiffs have failed to state a claim under any of their causes of action.

### A. Plaintiffs' Takings Claim Fails

Plaintiffs claim that being forced to comply with the Regulations amounts to an unconstitutional taking.  Compl. ¶ 180.  They are mistaken.  "The Takings Clause of the Fifth Amendment provides that 'private property [shall not] be taken for public use, without just compensation." *74 Pinehurst LLC v. N.Y.*, 59 F.4th 557, 563 (2d Cir. 2023) (quoting U.S. Const. amends. V, XIV, § 1), *cert. denied*, 2024 WL 674658 (U.S. Feb. 20, 2024).  "The Supreme Court has recognized two branches of Takings Clause cases: physical takings and regulatory takings." *1256 Hertel Ave. Assocs., LLC v. Calloway*, 761 F.3d 252, 263 (2d Cir. 2014) (citing *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 322 (2002)).  Plaintiffs have not alleged a cognizable claim under either theory.

### 1. *There Has Been No Physical Taking*

"When the government physically acquires private property for a public use, the Takings Clause imposes a clear and categorical obligation to provide the owner with just compensation." *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147 (2021) (citing *Tahoe-Sierra Pres. Council, Inc.*, 535 U.S. at 321).[12]

---

[12] "Examples of physical takings include using eminent domain to condemn property, . . . taking possession of property without taking title to it, . . . and occupying property . . . ." *Cmty. Hous. Improvement Program v. City of N.Y.*, 59 F.4th 540, 550 (2d Cir. 2023) (internal citations omitted).

The government effects a physical taking only where (1) "it *requires* the landowner to submit to the physical occupation of his land," *Yee v. City of Escondido, Cal.*, 503 U.S. 519, 527 (1992) (emphasis in original), or (2) when personal property is transferred from the owner to the government. *See Horne v. Dep't of Agric.*, 576 U.S. 350, 361-62 (2015) (finding physical taking because growers had been compelled by law to physically surrender grapes to government and explaining that "the government may prohibit the sale of raisins without effecting a per se taking" due to "the settled difference in our takings jurisprudence between appropriation and regulation" (quotation marks omitted)); *Maryland Shall Issue, Inc. v. Hogan*, 963 F.3d 356, 366 (4th Cir. 2020) (law making it illegal to manufacture, sell or even possess rapid fire trigger activators not a per se taking because it "does not require owners of rapid fire trigger activators to turn them over to the Government or to a third party").

Here, Defendants did not physically possess or occupy Plaintiffs' property, or authorize others to physically appropriate their property. The Regulations thus do not constitute a physical taking of their personal property. *See, e.g.*, *Andrus v. Allard*, 444 U.S. 51, 65 (1979) ("The regulations challenged here do not compel the surrender of the artifacts, and there is no physical invasion or restraint upon them. Rather, a significant restriction has been imposed on one means of disposing of the artifacts. But the denial of one traditional property right does not always amount to a taking"); *accord Buffalo Tchrs. Fed'n v. Tobe*, 464 F.3d 362, 374 (2d Cir. 2006) (alleged "interference with appellants' contractual right to a wage increase" not a physical taking).

Nor do the Regulations constitute a physical taking of Plaintiffs' real property. *See, e.g.*, *Cmty. Hous. Improvement Program v. City of N.Y.*, 59 F.4th 540, 551 (2d Cir. 2023) (finding no physical taking where rent stabilization law did not effect a physical occupation of the landlord's properties); *Our Wicked Lady, LLC v. Cuomo*, No. 21-cv-0165 (DLC), 2021 WL 915033 at *1, *6 (S.D.N.Y. Mar. 9, 2021) (finding no physical taking as the government did not physically occupy plaintiff's establishments through COVID-related indoor activity restrictions).

Finally, any allegation that the post-inspection seizures themselves constitute a taking fails: "government searches that are consistent with the Fourth Amendment and state law cannot be said to take any property right from landowners." *Cedar Point Nursery*, 594 U.S. at 161. Accordingly, Plaintiffs' claims relating to the inspections themselves rise and fall with the Fourth Amendment cause of action, discussed below at Point II(D).

      *2. There Has Been No Regulatory Taking*

Plaintiffs' claims are equally infirm when framed as a "regulatory taking." A regulatory taking occurs "when a regulation goes 'too far' in restricting a landowner's ability to use his own property." *74 Pinehurst LLC*, 59 F.4th at 564 (quoting *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1992)). "Regulatory takings are further divided into 'categorical' and non-categorical' takings." *Everest Foods, Inc. v. Cuomo*, 585 F. Supp. 3d 425, 442 (S.D.N.Y. 2022) (quoting *Sherman v. Town of Chester*, 752 F.3d 554, 564 (2d Cir. 2014)).

The Regulations are not a *per se* or categorical taking. "A categorical taking occurs when 'a regulation … denies all economically beneficial or productive use *of land*.'" *Everest Foods Inc.*, 585 F. Supp. 3d at 443 (quoting *Murr v. Wisconsin*, 582 U.S. 383, 384 (2017) (emphasis added)).[13] "Such a categorical regulatory taking occurs under 'narrow' circumstances." *335-7 LLC v. City of N.Y.*, 524 F. Supp. 3d 316, 331 (S.D.N.Y. 2021) (Ramos, J.) (quoting *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 539 (2005)). Here, Plaintiffs do not plausibly allege that the Regulations interfered with their use of their real property in any way, nor do they assert that their properties were deprived of all economic

---

[13] The Supreme Court has long found "categorical treatment appropriate [] where regulation denies all economically beneficial or productive use of land." *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992). Courts in this Circuit have not reached consensus on whether this rule applies beyond real property but have noted that "cases in which the Supreme Court has applied *Lucas*'s total takings rule have involved real property" and that "[t]he *Lucas* Court repeatedly referred to regulation that deprives '*land*' (not 'property') of all economically beneficial use, and subsequent decisions of the circuit courts have not reached a clear consensus on how broadly to apply *Lucas's* per se rule." *1256 Hertel Ave. Assocs., LLC*, 761 F.3d at 264-65 (finding resolution of the issue "unnecessary to our decision because there has been no taking under either standard.").

value because the Regulations only put limitations on the type of cannabinoid hemp products that
could be produced, distributed, or sold, but did not prevent them from operating their business
differently or through other means. *See Our Wicked Lady LLC*, 2021 WL 915033 at *6 (finding no
categorical taking imposed by COVID-era restrictions where plaintiffs could still operate their
businesses at limited capacity and through other means). Plaintiffs are still free to use their properties
for a wide variety of businesses, including but not limited to cannabinoid hemp businesses that trade
in conforming products.[14] Accordingly, their claim must fail.

However, even if Plaintiffs brought a non-categorical takings challenge (whether facial or as
applied), that too would fail. To analyze non-categorical takings claims, the Supreme Court "has
generally applied the flexible test developed in *Penn Central*, balancing factors such as the economic
impact of the regulation, its interference with reasonable investment-backed expectations, and the
character of the government action." *Cedar Point Nursery*, 594 U.S. at 148 (citing *Penn Central
Transportation Co. v. N.Y. City*, 438 U.S. 104, 124 (1978)).

a. Economic Impact

Plaintiffs' most incendiary claim is that they were forced to "effectively close their doors."
Compl. ¶ 182. But this is hyperbole: Plaintiffs' pleadings show that they are all still in business after
having been subject to the Emergency Regulations for four months and the current Regulations for
nearly as long. Rather, Plaintiffs allege that the Regulations have caused their businesses to lose
revenue, which they purport to quantify. Compl. ¶¶ 122, 127, 133, 141, 144, 155. Plaintiffs do not
even allege that they have become unprofitable, let alone allege that their businesses have actually been
destroyed.

In any event, Plaintiffs' allegations relate to the profitability of the particular businesses they

---

[14] In fact, Plaintiffs admit that "Raven's Landing was forced to substitute a large portion of its products to comply with
the requirements that products be a 15:1 CBD to THC ratio[,]" Compl. ¶ 132, demonstrating that it is, in fact, possible to
operate a business using products that comply with the challenged Regulations.

have chosen to enter, not their properties.  The Second Circuit has "rejected the notion that loss of profit—much less loss of a reasonable return—alone could constitute a taking." *Park Ave. Tower Assocs. v. City of N.Y.*, 746 F.2d 135, 139 (2d Cir. 1984).  And "it is clear that prohibition of the most profitable or beneficial use of a property will not necessitate a finding that a taking has occurred." *Id.* (quoting *Sadowsky v. N.Y.*, 732 F.2d 312, 317 (2d Cir. 1984)).  Even assuming that the Regulations have prohibited Plaintiffs from remaining in the cannabinoid hemp market (which they are *not* alleged to have done), "[r]egulations that bar trade in certain goods have been upheld against claims of unconstitutional taking." *Andrus* 444 U.S. at 67.  The Regulations have, at most, limited one possible use of Plaintiffs' property.  Even if the Regulations "prevent[ed] the most profitable use of [plaintiffs'] property," which Plaintiffs *do not allege*, that would not be sufficient to constitute a taking.  *See id.* at 66.  Considering that courts have repeatedly upheld "regulations which severely diminished the value of commercial property," Plaintiffs' failure to even attempt to quantify the impact on their *property*, rather than their businesses, is fatal.  *See Park Ave. Tower*, 746 F.2d at 139.

b.  <u>Reasonable Investment-Backed Expectations</u>

Plaintiffs should have expected regulatory changes as they knowingly entered into a highly regulated industry subject to ongoing fluctuations.  "The reasonableness of owners' expectations ensures that compensation is limited to those owners who can demonstrate that they bought their property in reliance on a state of affairs that did not include the challenged regulatory regime." *74 Pinehurst LLC*, 59 F.4th at 567.  In the context of rent regulations, courts have repeatedly held that it is reasonable for investors to expect that their properties would be subject to regulations which would change. *See e.g., id*; *335-7 LLC v. City of N.Y.*, 524 F. Supp. 3d at 333, 336.  Specifically, property owners "cannot claim that their reasonable expectations have been defeated when 'the legislative scheme is buttressed by subsequent amendments to achieve the legislative end.'" *74 Pinehurst LLC*, 59 F.4th at 568 (quoting *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602,

645 (1993)).  Similarly here, Plaintiffs knowingly entered into a highly regulated industry that was subject to change.  Indeed, the first regulation promulgated by the Board in relation to cannabinoid hemp explicitly warned: "the office [OCM] *may through future regulation* impose a total THC cap for the purpose of protecting public health, which shall include detectable levels of total Δ9-Tetrahydrocannabinol, Δ8-Tetrahydrocannabinol and Δ10-Tetrahydrocannabinol in milligrams per serving and milligrams per package for cannabinoid hemp products based on the product form, volume, number of servings, and ratio of CBD to THC."  9 NYCRR 114.8 (effective Nov. 21, 2021 to Oct. 4, 2022) (emphasis added).   As such, "the fact that this risk then results in a loss does not constitute a taking."  *74 Pinehurst LLC*, 59 F.4th at 567-68.  Accordingly, Plaintiffs fail to plausibly allege that the Regulations interfered with their reasonable investment-backed expectations.

### c.   Character of Governmental Action

The Regulations do not constitute a taking by placing a cap on the amount of THC in cannabinoid hemp products in order to protect broad public health needs.  Courts instruct that the focus should be "on the extent to which a regulation was 'enacted solely for the benefit of private parties' as opposed to a legislative desire to serve 'important public interests.'"  *74 Pinehurst LLC*, 59 F.4th at 568 (quoting *Keystone Bituminous Coal Ass'n v. Benedictis*, 480 U.S. 487, 485-86 (1987)). Regulations relating to a broad public interest cut against finding a taking has occurred.  *See id.* (holding that "public health, safety, and general welfare" are important public interests and that "courts are not in the business of second-guessing legislative determinations . . . ."); *Penn Central*, 438 U.S. at 132. Moreover, "government health and safety inspection regimes will generally not constitute takings." 594 U.S. at 161.  Here, the Regulations were similarly enacted "to protect public health, safety, and the general welfare" of New York State consumers of cannabinoid hemp products.  *See supra* at 8-10. As such, the Regulations' character weighs in Defendants' favor.

As each of the *Penn Central* factors weigh against Plaintiffs, any as-applied regulatory takings

19

claim fails.  A facial challenge would fail for the additional reason that Plaintiffs cannot, as they must, "establish that no set of circumstances exists under which the [challenged] Act would be valid." *74 Pinehurst LLC*, 59 F.4th at 562 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)) (finding that plaintiff's facial regulatory challenge to New York's Rent Stabilization Law failed because its economic impact could not be determined on a collective basis where no generalization as to harm to all landlords could be made).  Nowhere in Plaintiffs' complaint is there even a conclusory assertion regarding the impact on other non-party businesses in the industry, and thus, there is not even an attempt to state a facial regulatory takings claim.

### B.  Plaintiffs' Due Process Challenge to the Regulations Fails

#### 1.  *Plaintiffs Have Not Adequately Pled a Procedural Due Process Claim*

Plaintiffs claim the Regulations violate procedural due process, but "due process protections are not required when the government takes action that is legislative rather than adjudicative." *Edelhertz v. City of Middletown*, 943 F. Supp. 2d 388, 394-95 (S.D.N.Y. 2012) (Ramos, J.), *aff'd* 714 F.3d 749 (2d Cir. 2014); *see also Hopkins Hawley LLC v. Cuomo*, 518 F. Supp. 3d 705, 714 (S.D.N.Y. 2021) (holding that "it is black letter law that a person is not entitled to procedural due process protections against government action that is legislative in nature.").

"In the Second Circuit, 'the test for determining whether official action is adjudicative or legislative focuses on the function performed by the decisionmaker . . . .'" *Edelhertz*, 943 F. Supp. 2d at 395 (quoting *RR Vill. Ass'n*, 826 F.2d at 1204 (internal citations omitted)).  "A government action is legislative if it has 'general application' and looks to the future." *Hopkins Hawley LLC*, 518 F. Supp. 3d at 714 (quoting *Interport Pilots Agency, Inc. v. Sammis*, 14 F.3d 133, 143 (2d Cir. 1994)).  For example, this Court, in two COVID-era cases, found that due process challenges to executive orders restricting indoor activities were unlikely to succeed on the merits as the orders were legislative in nature due to their general and prospective application.  *See Hopkins Hawley LLC*, 518 F. Supp. 3d at 714 (noting

that the policy restricting indoor dining was "clearly legislative as it applies generally to all restaurants across New York and New York City, and because it applies prospectively."); *Our Wicked Lady LLC*, 2021 WL 915033 at *5 (noting that the policies restricting indoor dining and fitness activities "are legislative in nature because they apply prospectively to all restaurants and fitness centers in the City.").

Nor does the fact that the regulators "considered facts" in making their "across the board" decision transmute a legislative action into an adjudicative one. *Edelhertz*, 943 F. Supp. 2d at 395-96 (rejecting assertion that law "was adjudicative—and not legislative—. . . because it was based on a host of targeted facts") (quotation marks omitted).

The Regulations are generally applicable to all cannabinoid hemp products intended to be sold in the New York market and are meant to apply prospectively—a paradigmatic example of a legislative rather than adjudicative act. Thus, Plaintiffs raise a challenge to a purely legislative action and fail to state a procedural due process claim.

### 2. *Plaintiffs' Substantive Due Process Claim Fails*

Initially, Plaintiffs seek to challenge the Regulations both on Takings Clause and Substantive Due Process grounds. Plaintiffs cannot do both. It is well established that, "where a § 1983 plaintiff alleges a cause of action protected by an 'explicit textual source' of the Constitution, 'that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing' that claim." *Kaluczky v. City of White Plains*, 57 F.3d 202, 211 (2d Cir. 1995) (quoting *Albright v. Oliver*, 510 U.S. 266, 273 (1994)). Thus, a plaintiff bringing a Takings Clause challenge to a legislative act cannot also bring a substantive due process clause challenge. *See e.g., 74 Pinehurst LLC*, 59 F.4th at 569; *Cmty. Hous.*, 59 F.4th at 556.

Even if Plaintiffs could bring a substantive due process claim, it would fail on the merits. Substantive due process "protects against certain government actions regardless of the fairness of the procedures used to implement them." *Bryant v. N.Y. State Educ. Dept.*, 692 F.3d 202, 217 (2d Cir. 2012)

21

(internal quotations and citations omitted).  In considering a challenge to a governmental regulation, "where . . . a statute neither interferes with a fundamental right nor singles out a suspect classification, we will invalidate that statute on substantive due process grounds only when a plaintiff can demonstrate that there is no rational relationship between the legislation and a legitimate legislative purpose." *Sensational Smiles, LLC v. Mullen*, 793 F.3d 281, 284 (2d Cir. 2015) (quoting *Molinari v. Bloomberg*, 564 F.3d 587, 606 (2d Cir. 2009)).[15]

"Rights are fundamental when they are implicit in the concept of ordered liberty, or deeply rooted in this Nation's history and tradition." *Goe*, 43 F.4th at 30 (quoting *Leebaert*, 332 F.3d at 139). Here, Plaintiffs do not identify *any* right that the Regulations have infringed upon, let alone a fundamental one.  The Complaint alleges that the passage of the Regulations "forc[ed] Plaintiffs to pull almost all cannabinoid hemp products from their shelves and effectively close their doors." Compl. ¶¶ 182, 193.  That claim, given a liberal construction, at most alleges a violation of Plaintiffs' right to earn a livelihood in the area of their choosing.  And, "[a]lthough courts have recognized that the due process clause 'includes some generalized due process right to choose one's field of private employment,' that right 'is nevertheless subject to reasonable government regulation.'" *Everest Foods*

---

[15] The Supreme Court has maintained that "[w]hile due process protection in the substantive sense limits what the government may do in both its legislative . . . and its executive capacities, . . . , criteria to identify what is fatally arbitrary differ depending on whether it is *legislation* or *a specific act* of a governmental officer that is at issue." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (emphasis added; internal quotation marks and citations omitted).  The Second Circuit has explained that this holding applies not just to legislation, but to *governmental regulation*.  *Leebaert v. Harrington*, 332 F.3d 134, 139-140 (2d Cir. 2003).

The Regulations at issue here constitute a governmental regulation as opposed to governmental conduct, and as such, the shocks the conscience test does not apply here.  *See Goe v. Zucker*, 43 F.4th 19, 30 (2d Cir. 2022) ("We use the shocks the conscience test to assess substantive due process challenges to *government conduct*.") (emphasis added)); *Karol v. City of N.Y.*, 396 F. Supp. 3d 309, 322 (S.D.N.Y. 2019) (noting that courts apply rational basis review to challenges to a government's justification for a regulation but use the shocks the conscience test to assess whether conduct enforcing that regulation constitutes an abuse of authority).

Even if the Court were to view Plaintiffs as raising an as applied challenge to government conduct, the Regulations would hardly shock the conscience.  *See, e.g., Hopkins Hawley LLC*, 518 F. Supp. 3d at 715 (finding an allegation that regulations go against the grain of scientific proof did not meet this high bar); *Everest Foods Inc.*, 585 F. Supp. 3d at 439 (finding that conduct did not meet this standard as no deprivation of a property right was alleged where regulations only limited available economic activity).

*Inc.*, 585 F. Supp. 3d at 440 (quoting *Conn v. Gabbert*, 526 U.S. 286, 291-92 (1999)). "To state a claim as Plaintiffs here seek to do, they must allege 'a complete prohibition of the right to engage in a calling….'" *Id.* (quoting *Conn.*, 526 U.S. at 292) (rejecting a claim that COVID-era dining restrictions constituted a deprivation of the right to earn a livelihood where all business operations were not foreclosed). Indeed, "business losses alone do not implicate the Due Process right of occupational choice." *Hu v. City of N.Y.*, 927 F.3d 81, 102 (2d Cir. 2019) (rejecting a claim that discriminatory enforcement actions deprived plaintiffs of their right to pursue their profession of choice where they were not driven out of business). Moreover, "[t]he Supreme Court has, for nearly a century, consistently rejected economic liberties as constituting fundamental rights." *Hopkins Hawley LLC*, 518 F. Supp. 3d at 715.

As the Regulations here (1) specifically provide a regime for the sale of cannabinoid hemp products, and (2) do not preclude Plaintiffs from seeking to sell any of their products under an adult-use cannabis license, Plaintiffs cannot plausibly allege that the Regulations contemplate "a complete prohibition" on their right to earn a living in that field. Accordingly, Plaintiffs do not allege a violation of a fundamental right. *See generally* 9 NYCRR Part 114; *supra* at 7-10.

"When the right asserted is not fundamental, courts consider whether the government action at issue is 'rationally related to a legitimate state interest.'" *Our Wicked Lady LLC*, 2021 WL 915033 at *4 (quoting *Grand River Enterprises Six Nations, Ltd. v. Boughton*, 988 F.3d 114, 122 (2d Cir. 2021)). "Rational basis review is not a post-hoc test of the effectiveness of a legislative policy . . . Rather, we examine whether, at enactment, there is a rational link between the harm a statute is intended to remedy and the method by which a legislature chooses to address it." *Grand River Enterprises*, 988 F.3d at 122-23 (holding that there was no substantive due process violation because the state had a rational basis for implementing reporting requirements for cigarette manufacturers that do not already participate in an agreement with state attorneys general to, *inter alia*, restrict advertising and make

offsetting payments).

There can be little doubt that the Regulations relate to a legitimate state interest. The New York State Legislature authorized the Board and OCM to regulate the processing and sale of cannabinoid hemp products in New York State. *See* NYCL § 91. Pursuant to that authority, the Board adopted the Regulations, which it deemed:

> necessary to immediately allow [OCM] to address several challenges with the processing of cannabinoid hemp products in New York State and to protect public health, safety, and the general welfare of consumers in New York State from the immediate threat posed by the processing and retail sale of intoxicating cannabinoid hemp products in New York State . . . [and] to ensure that consumers are not misled by these products' marketing and that these products truly are not better suited for the adult-use cannabis market.

45 NY Reg 1, RIS. Moreover, there is clearly a rational link between the State's interest in protecting consumers in New York State from intoxicating cannabinoid hemp products and the method by which the Board and OCM chose to address it in the Regulations. The changes made to the CBD:THC ratio in the Regulations were made based on the conclusion that the Farm Bill's "weight-based concentration limit . . . has not been sufficient to restrict the development and sale of new products with intoxicating levels of THC." *Id.* And in reaching the specific ratio provided for in the Regulations, OCM "completed a regulatory analysis of the eight states with THC limits imposed on cannabinoid hemp products, the available peer reviewed literature, and task force recommendations from three states that convened task forces, as well as analyzed numerous studies to determine an appropriate level of THC in cannabinoid hemp products." *Id.* Further, OCM "reached out to businesses for implementation and impact input[,]" and addressed their concerns "by way of implementation timeframes for labeling and ensuring that these regulations do not unduly impact current production and transportation of these products within New York State." *Id.* OCM and the Board also made a clear commitment to continue to update the Regulations if and when new data

24

justified doing so.  *Supra* at 10.[16]

Plaintiffs' chief argument on their due process claim is that the Regulations were passed "without legal justification" and "no factual evidentiary basis." Compl. ¶ 193.  Plaintiffs' assertion appears to be based almost entirely on their mischaracterization of the decision in *North Fork*.  *See* Compl. ¶¶ 50-53.  That decision dealt with a different regulation (the Emergency Regulations), and even in that case the Court maintained that "the question is not whether respondents have the power to adopt regulations governing hemp infused products—they do."  *N. Fork Distribution, Inc.*, 81 Misc. 3d at 958.  More importantly, the decision involved an entirely different legal issue: namely, the presence of a valid **emergency** justification under SAPA.  Plaintiffs' argument is simply not properly framed under the Substantive Due Process Clause.  As explained *supra,* there must be "a rational link between the harm a statute is intended to remedy and the method by which a [regulator] chooses to address it."  *Grand River Enterprises*, 988 F.3d at 123.  The Court can and should determine whether there is such a link on a 12(b)(6) motion. *See id.* (affirming dismissal of substantive due process claim under Rule 12(b)(6)).  It is abundantly clear that there is such a link.  *See supra* at 23-24.  Once the Court finds such a link, it need look no further, and Plaintiffs' objections to the alleged quality of the evidence utilized by OCM are not sufficient to state a claim.

## C.    Plaintiffs' Supremacy Clause Claim Fails

While the phrase "Supremacy Clause" appears nowhere in Plaintiffs' complaint, Plaintiffs' memorandum in support of their preliminary injunction request ("PI Mem.") extensively discussed

---

[16] The regulations also prevent businesses from circumventing the adult-use cannabis market, which would allow them to pay less in taxes, providing an additional rational basis for them.  Under New York's Tax Law, adult-use distributors must pay an excise tax (potency tax) to the processor in addition to what they pay for the product. The tax is dependent on the amount of THC in the product. *See* N.Y. Tax Law § 493(a).  However, for cannabinoid hemp products, distributors do not pay this potency tax, they only pay the sales tax applicable under Tax Law Article 28 (which applies to tangible personal property).  Although this particular basis was not addressed in the SAPA documents, the Court may consider it. *See, e.g., F.C.C. v. Beach Commc'ns, Inc.,* 508 U.S. 307, 315 (1993) (holding, in rejecting equal protection challenge subject to rational basis review, "because we never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature.").

*Bio-Gen, LLC v. Sanders,* No. 23-CV-00718-BRW, 2023 WL 5804185 (E.D. Ark. Sept. 7, 2023), which is primarily about preemption under the Supremacy Clause.[17]  This claim was not pled in the Complaint, and accordingly the Court can disregard it.  *See Olsen v. Doldo*, No. 16-CV-5366 (RA), 2017 WL 1422431, at *2 (S.D.N.Y. Apr. 20, 2017) (collecting cases).[18]  Even if the Court did consider that claim, however, it would fail.

Consistent with the Supremacy Clause, "state laws that conflict with federal law are 'without effect.'" *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008) (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981)).  Yet, there is a "presumption against preemption" in all preemption cases, and "particularly in those in which Congress has legislated . . . in a field which the States have traditionally occupied," even when "the Federal Government has regulated [in that field] for more than a century." *Wyeth v. Levine*, 555 U.S. 555, 565 & n.3 (2009) (quotation marks and citations omitted); *see also N.Y. Pet Welfare Ass'n, Inc. v. City of N.Y.*, 850 F.3d 79, 86 (2d Cir. 2017) ("The heavy burden of overcoming this presumption falls on the party alleging preemption.").

As an initial matter, not a single case throughout the country, including *Bio-Gen*, the sole case Plaintiffs rely on, has found field preemption in regard to the Farm Bill.  As such, Plaintiffs have conceded that it does not apply here.  *See* PI Mem. at 6-7; *see also N. Va. Hemp & Agric. LLC v. Va.*, No. 123-CV-1177LMBIDD, 2023 WL 7130853, at *7 (E.D. Va. Oct. 30, 2023) (rejecting field preemption claim relating to Farm Bill).

Nor does express preemption apply.  Congress explicitly explained what was and was not being preempted.  Congress did preempt prohibition of "the transportation or shipment of hemp or

---

[17] The only other claim discussed was a vagueness claim, which Plaintiffs do not even implicitly raise.

[18] Moreover, all six of Plaintiffs' causes of action are pled under § 1983, and § 1983 does not provide a cause of action for violations of the Supremacy Clause, *Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 321 (2d Cir. 2005), or the Farm Bill's preemption provision. *See Serna v. Denver Police Dep't*, 58 F.4th 1167, 1170 (10th Cir. 2023) (§ 10014(b) of Farm Bill); *Dines v. Kelly*, No. 222CV02248KHVGEB, 2022 WL 16762903, at *7 (D. Kan. Nov. 8, 2022) ("The 2018 Farm Act does not create a private right for plaintiff to possesses and sell hemp and hemp products.").

hemp products produced in accordance with [federal law] through the State . . ." *Id.* at § 10114. In context, this is best understood to refer to the "interstate transportation" of hemp. *C.Y. Wholesale, Inc. v. Holcomb*, 965 F.3d 541, 547 (7th Cir. 2020). Nothing in the Regulations, however, contains any such prohibition, and Plaintiffs do not argue otherwise.[19] Congress otherwise explicitly preserved the States' ability to regulate "the production of hemp" in a manner "more stringent than this subtitle" within their own borders, in a clause marked "no preemption." *Id.* at § 10113 (codified at 7 U.S.C. § 1639p). Accordingly, as the Seventh Circuit held, when upholding a law that *criminalized* manufacture, delivery of, or *possession* of smokable hemp, "[t]he Farm Law['s] . . . express preemption clause places no limitations on a state's right to prohibit the cultivation or production of industrial hemp" and does not "preclude[] a state from prohibiting the possession and sale of industrial hemp within the state." *C.Y. Wholesale, Inc.* 965 F.3d at 547. *Accord Duke's Invs. LLC v. Char*, No. CV 22-00385 LEK-RT, 2022 WL 17128976, at *7 (D. Haw. Nov. 22, 2022) (regulations concerning "sale, offer, or distribut[ion] [of] hemp products within the State," including import into the state, were not expressly preempted (quotation marks omitted)); *N. Va. Hemp and Agriculture*, 2023 WL 7130853 at *5-*6 (express preemption argument "ignores the express permission granted to states and Indian tribes in the Farm Act to enact 'more stringent' regulations of hemp production.").

Those same provisions also compel a finding that conflict preemption does not apply. As the Seventh Circuit explained:

> Although Congress may have relaxed federal restrictions on low-THC cannabis in
> order to facilitate a market for hemp, the [Farm] Law indicates that the states were to
> remain free to regulate industrial hemp production within their own borders. Despite
> legalizing industrial hemp on the federal level, the Farm Bill expressly permits the
> states to adopt rules regarding industrial hemp production that are "more stringent"

---

[19] On the contrary, the regulation on "transport" of hemp allows such transport as long as the hemp "is in a fully enclosed vehicle or container[,]" provides proof of origin information, and is accompanied by a certificate of analysis showing that the products constitute hemp under the Farm Bill (*i.e.*, is "accompanied by a certificate of analysis showing that the hemp extract has a total Δ9-Tetrahydrocannabinol of no more than three tenths of a percent (0.3%).").  9 NYCRR 114.14(f) (regulating hemp extract).

than the federal rules.

*C.Y. Wholesale, Inc.*, 965 F.3d at 548 (quoting Pub L. 115-334 § 10113). [20]

The sole case relied on by Plaintiffs is an inapposite outlier. *Bio-Gen* found express preemption because it was concerned that an exception to a broad prohibition on most industrial hemp for "continuous transportation" did not clearly encompass all interstate transport. 2023 WL 5804185 at *7. New York's regulations regarding "transport" do not require "continuous transportation." 9 NYCRR 114.14(f).

*Bio-Gen* also found conflict preemption on the grounds that although "Arkansas can regulate hemp production and even ban it outright if it is so inclined," the law had inappropriately tried to "chang[e] definitions in a federal program," seemingly adopting Plaintiffs' argument that the law effectively "places federally protected hemp back on the controlled substance list." *Id.* at *5-*6. The Regulations do not attempt to change the federal definition of hemp. The core regulation objected to by Plaintiffs does not redefine cannabinoid hemp but simply states that any cannabinoid hemp "distributed or offered for retail sale in New York" must meet certain criteria such as the THC to CBD ratio. 9 NYCRR 114.8. The Regulations simply "state[] that certain derivatives of hemp – though still meeting the definition of hemp – are more stringently regulated within [New York]." *Duke's Investments*, 2022 WL 17128976 at *6. Nothing in the Farm Bill precludes such a regulation. It is noteworthy that the very Congressional report quoted by Plaintiff at the preliminary injunction oral argument, Tr. at 3:7-15, supports Defendants here, because it explicitly states that "[S]tates and Indian tribes may limit the production *and sale* of hemp and hemp products within their borders." H.R. Conf. Rep.. 115-1072 at Title X-Horticulture, § 8 (Hemp Production) (2018) (emphasis added).

---

[20] A*ccord Duke's Investments*, 2022 WL 17128976 at *5-*6; *N. Va. Hemp and Agriculture*, 2023 WL 7130853 at *8-*10; *Free Spirit Organics, NAC v. San Joaquin Cnty. Bd. of Supervisors*, No. 17-CV-02271 (KJM) (JDP), 2022 WL 902834, at *4 (E.D. Cal. Mar. 25, 2022); *AK Indus. Hemp Ass'n, Inc. v. Alaska Dep't of Nat. Res.*, No. 23-CV-00253-SLG, 2023 WL 8935020, at *4-*5 (D. Alaska Dec. 27, 2023).

Moreover, products that cannot be sold as cannabinoid hemp are not even banned; they simply must instead be sold through the "Adult-Use Cannabis Program where additional safeguards are in place to prevent youth and adolescent use and to protect public health, safety, and welfare of consumers in New York State." 45 NY Reg 1, Assessment.

In any event, even if *Bio-Gen* was applicable, Defendants respectfully submit that the multiple cases finding that the Farm Bill does not preempt regulations of the production, sale, and distribution of hemp have greater persuasive value. *Bio-Gen* does not attempt to engage with the multiple prior cases finding that the Farm Bill has no preemptive effect outside the context of interstate transportation. 2023 WL 5804185 at *4-*7. Defendants respectfully submit that the analysis of those cases, cited *supra*, is unassailable.

### D.  Plaintiff's Fourth Amendment Claim Fails

The crux of Plaintiffs' Fourth Amendment challenge is their claim that Defendants engaged in "raid[s]" of Plaintiffs' property "without a warrant." Compl. ¶¶ 73-74, 94, 109, 149, 159. Plaintiffs' challenge is based on a fundamentally flawed premise: far from being unconstitutional "raids," the challenged actions were made pursuant to well-established jurisprudence allowing for warrantless inspections of "closely regulated industry[ies]" by those industries' regulators. *See generally Burger,* 482 U.S. at 700 (internal quotation marks omitted). Such an inspection, including seizures pursuant to that inspection, is valid if three criteria are met:

> First, there must be a substantial government interest that informs the regulatory scheme pursuant to which the inspection is made. . . . Second, the warrantless inspections must be necessary to further [the] regulatory scheme. . . . Finally, the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant.

*Id.* at 702-03 (citation and quotation marks omitted). "The warrantless search exception applies to searches authorized pursuant to valid agency regulations, as well as to statutes." *Anobile v. Pelligrino*, 303 F.3d 107, 118 (2d Cir. 2002). As one court has already found, OCM's inspections fall easily into

this exception.  *See* Order, *N.Y. State Office of Cannabis Mgmt. v. Tulley*, No. CV089825, Dkt No. 61, Slip

Op. at 3 (N.Y. Sup. Ct. Wayne Cnty. Nov. 6, 2023)[21] (rejecting Fourth Amendment objection to OCM

enforcement action: "The Court finds that government regulation of the cannabis industry is extensive

and OCM's regulatory scheme afforded the Tulley Respondents sufficient due process protections.").

Here, Plaintiffs have not stated a claim for a Fourth Amendment violation.[22]

        *1.  The Cannabis/Cannabinoid Hemp Industries Are "Closely Regulated"*

      A "closely regulated" industry "is essentially defined by the pervasiveness and regularity of the

. . . regulation and the effect of such regulation upon an owner's expectation of privacy."  *Burger*, 482

U.S. at 701 (quotation omitted).  The presence of "similarly extensive" regulations in other states

"further supports" a finding that a given industry is regulated.  *Id.* at 705.  While the "duration" of the

regulatory scheme in question ordinarily has some relevance, there cannot be an expectation of an

"ancient history of government oversight" in a case where the industry is "a relatively new

phenomenon in our society."  *Id.* at 705-6.

      The Supreme Court has held that the liquor industry (along with firearm sales and coal mining)

is a quintessential example of such an industry.  *See Burger*, 482 U.S. at 700-01 (discussing *Colonnade

Corp. v. United States*, 397 U.S. 72 (1970)).  The Second Circuit has found an industry (in that case,

horse racing and wagering) to be closely regulated when, as here, the New York Legislature both

created laws to regulate the industry and an agency with jurisdiction over the industry and the power

to promulgate rules over that industry.  *Anobile*, 303 F.3d at 111-12.  Industries that courts in this

---

[21]*Available at* https://iapps.courts.state.ny.us/nyscef/ViewDocument?docIndex=l5OBVmX1DHTC7WPPgner2A==. (last visited June 18, 2024).

[22] While *Burger's* "necessary to further" element sometimes requires presentation of evidence to the Court, it is possible to find that a complaint fails to state a claim because it does not contain details leading to a plausible allegation that the inspections did not further the regulatory scheme.  *See New Page at 63 Main, LLC v. Inc. Vill. of Sag Harbor*, No. 15-CV-2433 (ADS) (AKT), 2016 WL 8653493, at *23 (E.D.N.Y. Mar. 19, 2016), *aff'd*, 674 F. App'x 23 (2d Cir. 2016); *see also Blue v. Koren*, 72 F.3d 1075, 1081 (2d Cir. 1995) (upholding granting of summary judgment regarding Fourth Amendment claim, but doing so simply on the basis of the relevant laws and a finding that "[t]here is no allegation or proffer of evidence in the present case that even remotely suggests a valid Fourth Amendment claim under this test").

circuit have found to be closely regulated include nursing homes, *Blue v. Koren*, 72 F.3d 1075, 1081 (2d Cir. 1995); the food service industry, *Players, Inc. v. City of N.Y.*, 371 F. Supp. 2d 522, 537 (S.D.N.Y. 2005), the solid waste industry; *Meserole St. Recycling, Inc. v. City of N.Y.*, No. 06 CIV. 1773 (AKH), 2009 WL 10739210, at \*4 (S.D.N.Y. Nov. 25, 2009); schools participating in the federal school lunch program, *United States v. Sorcher*, No. 05-CV-0799 (NG) (RLM), 2007 WL 1160099, at \*4 (E.D.N.Y. Apr. 18, 2007) and, most notably for this case, the cigarettes industry, *United States v. Mansour*, 252 F. Supp. 3d 182, 191-194 (W.D.N.Y. 2017); *see also United States v. Hamad*, 809 F.3d 898, 905 (7th Cir. 2016) (cigarette/tobacco industry in Chicago closely regulated).

The cannabis/cannabinoid hemp industries are just as closely regulated. The Cannabis Law sets up a detailed licensing and regulatory regime for medical cannabis (article 3), adult-use cannabis (article 4), and cannabinoid hemp and hemp extract (article 5). The Cannabis Law has 139 sections governing New York's oversight of these products, including: adult-use advertising and marketing restrictions (§ 86); licensing for recreational and medical cannabis and cannabinoid hemp; (§§ 34-38, 68-72, 92-100); packaging, labelling, and testing requirements for cannabinoid hemp and/or hemp extract (§§ 103, 105); rules on processing those products (§ 104); a framework establishing product grades and standards (§ 106); and penalties for non-compliance (§§ 16-a, 107, 132). The Cannabis Law also established both the Board and OCM, providing them collectively with an extensive set of powers ranging from licensing, revocation, hearings and inspections among others. NYCL §§ 10-11. *Compare Anobile*, 303 F.3d at 111 (similarly describing powers of New York State Racing and Wagering Board). Moreover, thirty-eight states as well as the District of Columbia have laws that regulate the recreational and/or medical use of cannabis and an additional ten have programs for products at least similar to what New York terms cannabinoid hemp.[23] Accordingly, the cannabis/cannabinoid hemp

---

[23] *See Brinkmeyer v. Washington State Liquor & Cannabis Bd.*, No. C20-5661 BHS, 2023 WL 1798173, at \*1 (W.D. Wash. Feb. 7, 2023) (37 states and DC legalized recreational or medical cannabis as of 2/7/23 and additional ten "have cannabidiol ('CBD') or low THC programs"); 2023 Kentucky Senate Bill 47 (signed into law 3/31/23).

industries constitute "closely regulated" industries.

2. *There Is a Substantial Government Interest Favoring Regulation of The Cannabis/Cannabinoid Hemp Industries*

New York has a clear interest in protecting the public, by ensuring that only properly licensed entities are selling authorized products and ensuring that those products are compliant with the Cannabis Law and its implementing regulations. Indeed, the very regulations at issue in this lawsuit are among many promulgated by OCM in an effort to protect the public by ensuring consumers understand the nature of a product being purchased. *Supra* at 8-10, 23-25. Just as the government "clearly has a substantial government interest in ensuring the health of its food supply," *Players*, 371 F. Supp. 2d at 538, so too does the government have an interest in ensuring that consumers receive products that meet standards intended to protect their health and safety and receive those products from authorized licensees.

Moreover, the Supreme Court has also found a compelling interest in regulating liquor due to the interest in "protecting the revenue against various types of fraud." *Colonnade*, 397 U.S. at 75. A similar interest was found to support an administrative search program relating to cigarettes. *Mansour*, 252 F. Supp. 3d at 194. Such an interest applies equally strongly to cannabis/cannabinoid hemp, in which the government has an interest in protecting the revenue against various types of fraud. *See, e.g.*, Cannabis Law §§ 63, 96 (imposing various license-related fees); N.Y. Tax Law Article 20-B (Excise Tax on Medical Cannabis); Article 20-C (Tax on Adult-Use Cannabis Products); Article 28 (sales tax on tangible personal property, which includes cannabinoid hemp).

3. *The Inspections Are Necessary to Further the Regulatory Scheme*

Where, as here, an industry is the subject of extensive regulations, a search pursuant to those regulations is acceptable as long as the searches are "(i) related to [the subject matter] in the broadest sense," (ii) "do not intrude in areas unrelated to [the industry's operations] and in which the owner or operator has an expectation of privacy"; and "(iii) do not interfere with the operation of the facility in

ways that are demonstrably unrelated to the legitimate purposes of the inspection." *See Blue*, 72 F.3d at 1081 (upholding search in nursing homes).[24]  Alternatively, a warrantless inspection is always necessary in instances where "surprise is critical" to the regulatory scheme. *Burger*, 482 U.S. at 701; *see also United States v. Biswell*, 406 U.S. 311, 316 (1972) (stating in relation to firearms inspections: "Here, if inspection is to be effective and serve as a credible deterrent, unannounced, even frequent, inspections are essential.  In this context, the prerequisite of a warrant could easily frustrate inspection; and if the necessary flexibility as to time, scope, and frequency is to be preserved, the protections afforded by a warrant would be negligible.").[25]

While an inspection's primary purpose cannot be criminal law enforcement or a pretext for obtaining evidence of general criminal activity, *Anobile*, 303 F.3d at 118, a "mixed purpose" search is permissible "if the administrative inspection is authorized and legitimate." *United States v. Funaro,* 253 F. Supp. 2d 286, 296–97 (D. Conn. 2003); *United States v. Sorcher,* No. 05–CR–0799(NG)(RLM), 2007 WL 1160099, at *1, *5 (E.D.N.Y. Apr. 18, 2007).[26]

Here, the Court can conclude, even from the face of the complaint, that the inspections in question are necessary to further the regulatory regime.  To begin with, there can be no serious question that the element of surprise is at least as important for cannabis and cannabinoid hemp as it is for cigarettes, which standing alone, is sufficient to meet this element of *Burger*.  Even assuming

---

[24] Plaintiffs may argue that *Blue* is inapplicable because the Second Circuit there found a "virtually non-existent" right to privacy in nursing homes "with regard to matters related to their compliance with patient care rules and regulations." *Blue*, 72 F.3d at 1081.  Defendants respectfully submit that a commercial operator's privacy rights "with regard to matters related to their compliance with [consumer-protection] rules and regulations" are similarly "virtually non-existent" but regardless, *Blue's* analysis still provides a useful rubric for analyzing an inspection's compliance with this element of *Burger*.

[25] *Accord Players,* 371 F. Supp.2d at 538 (food establishment inspection scheme "would be . . . frustrated by imposition of a notice or warrant requirement" due to the opportunity such notice would provide to business establishments to "conceal violations"); *Mansour*, 252 F. Supp. 3d at 195-201 (warrant requirement for cigarette inspection scheme unnecessary because such a requirement would be "inconvenient" and regardless, element of surprise was critical for cigarettes that "are small and easily-concealed").

[26] *See also Mansour*, 252 F. Supp. 3d at 201 ("There is no question that administrative and criminal investigations may, at least as a general matter, proceed in parallel, and the fact that certain conduct may violate both administrative and criminal statutes does not mean that both administrative and criminal agents may not investigate that conduct.")

Plaintiffs have plausibly alleged that surprise is not necessary to the regulatory scheme, the inspections also easily meet the three criteria set forth by *Blue.*

        a.   <u>The Inspections Were Related to OCM's Regulatory Authority "In The Broadest Sense"</u>

Plaintiffs admit being informed that they were the subjects of "an inspection." Compl. ¶¶ 74 ("Defendants then stated that they needed to conduct an inspection" of Hidden Hemp's Headquarters); Compl. ¶¶ 102-03 (referring to individuals who searched the Green Room as "inspector[s]"); Compl. ¶ 146 ("Defendants, through their employees, agents, or representatives conducted two inspections at Windy Hill"). Plaintiffs also allege that they themselves are all part of the "hemp-infused products" industry, Compl. ¶ 2, and the inspections and seizures in question were of premises within that industry. *See* Compl. ¶¶ 70-118, 145-55. Despite alleging that some of the inspections were conducted by New York Police Department officers, Plaintiffs nowhere allege that they ever faced criminal charges arising from those inspections or were even told that the inspections had any criminal component at all. It is clear from the complaint, then, that the inspections related to OCM's regulatory regime and had no criminal purpose. At the most, Plaintiffs have alleged that they were subject to "mixed purpose" searches, which is permissible. *See supra* at 11.

While Plaintiffs nevertheless argue that the searches and seizures at issue could not have been within the scope of OCM's authority, those allegations fail in the face of the relevant law. First, they appear to claim that the pre-November 2023 searches at issue did not fall within the "Prior Hemp Regulations[']" provisions relating to random sampling and testing of processors. Compl. ¶ 40. But the Cannabis Law itself always gave OCM significantly broader authority: "[t]o inspect or provide authorization for the inspection . . . of any premises where medical cannabis, adult-use cannabis or cannabinoid hemp and hemp extract is cultivated, processed, stored, distributed or sold." Original

Cannabis Law § 11.[27]

Plaintiffs also claim that "noticeably absent from the Hemp Regulations are any statutes or guidelines concerning the seizure of cannabinoid hemp products from otherwise validly licensed hemp retailers." Compl. ¶ 41. That claim, however, is also simply not true. Cannabis Law § 103 has permitted seizure of nonconforming products since the MRTA was promulgated and the current Cannabis Law § 138-a(1)-(2) has further broadened that authority. *Supra* at 6-7.

Finally, Plaintiffs claim the inspections were "politically motivated as a means to crack down on New York State's rampant illegal cannabis and hemp retail market." Compl. ¶ 161. Plaintiffs do not attempt to explain why a goal of "crack[ing] down on . . . illegal cannabis and hemp" would be outside of OCM's powers. Plaintiffs allege that *they* did not act illegally, but proof that Plaintiffs acted illegally is not necessary to show that OCM has the right to inspect Plaintiffs' stores for activity that potentially did violate applicable statutes and regulations.[28] And, in any event, as long as the inspections had a regulatory component, which can clearly be seen even from the face of the complaint, *supra* at 34, OCM's "motive is irrelevant, because a Fourth Amendment claim must be based on a showing that the search in question was objectively unreasonable." *Blue*, 72 F.3d at 1081.

Accordingly, the inspections clearly related to OCM's remit "in the broadest sense."

---

[27] While Plaintiffs allege that OCM was also "taking legal possession of Hidden Hemp overnight," Compl. ¶ 81, the actual events described by that complaint consist of an inspection that began during the day time, continued overnight, and resulted in the seizure of products, for which an inventory was provided. *Id.* ¶¶ 70-83.

[28] Is it notable that, while Plaintiffs elsewhere claim that the inspectors did not know under what authority they were seizing products or why what they were seizing is illegal, Compl. ¶¶ 100-101, it is clear that in two instances in which inspectors found potentially offending product, that product was seized, and in instances where inspectors found no such product, no further action was taken. *Id.* ¶ 81 (Hidden Hemp told that "seized products would be tested" to conclusively determine their legality); *id.* ¶ 104 ("Defendants provided Mr. Breslav [of the Green Room] with an inventory list of the unlawfully seized products and told him they would advise of any violations at a later date"); *id.* ¶¶ 145-54 (no allegations of any seizures of products from Windy Hill following two inspections).

b.  The Inspections "Do Not Intrude in Areas Unrelated To [The Industry's Operations] and in which The Owner or Operator Has An Expectation of Privacy"

Plaintiffs, for good reason, do not allege that any areas with a heightened expectation of privacy were searched.  On the contrary, they allege that inspections took place on the Hidden Hemp location used to store and distribute products, Compl. ¶¶ 72-73, on one of the Green Room's "retailer locations", Compl. ¶¶ 93-94, 109, and a Windy Hill "store."  Compl. ¶¶ 147-49.

c.  The Inspections' Disruptions Were Related To Their Legitimate Purpose

Far from alleging that the inspections created disruptions "demonstrably unrelated to the legitimate purposes of the inspection," all alleged disruptions arose directly from the process of searching for nonconforming products, Compl. ¶¶ 75-76, the seizures themselves, Compl. ¶¶ 87, 107, or the alleged reputational harm caused simply by the very fact of the inspections, and/or consumers witnessing those inspections.  *Id.* ¶¶ 89, 108, 151-53.[29]

Accordingly, because the inspections either (a) clearly required the element of surprise and/or (b) satisfy the rubric set forth by *Blue*, they were "necessary to further the regulatory scheme."  Because Plaintiffs make "no allegation or proffer of evidence in the present case that even remotely suggests a valid Fourth Amendment claim," *Blue*, 72 F.3d at 1081, their claim can be rejected at the motion to dismiss stage.

4.  *OCM's Inspection Program Contains the Requisite Certainty and Regularity*

Regulatory inspections under the Cannabis Law provide certainty and regularity of application

_____

[29] The allegation that employees were not allowed to use the restroom or make phone calls, seemingly for three hours, Compl. ¶¶ 76-77, does not alter this conclusion.  It is evident that any actions taken were to preserve the element of surprise, given that Mr. Kampf, Hidden Hemp's owner, was called three hours into the search.  Compl. ¶ 77.  Even a full detention can be permissible pursuant to a valid search.  *See, e.g., Muehler v. Mena*, 544 U.S. 93, 98 (2005) (upholding 2-3 hour  detention pursuant to search stating that "officers executing a search warrant for contraband have the authority 'to detain the occupants of the premises while a proper search is conducted.'" (quoting *Michigan v. Summers*, 452 U.S. 692 (1981)).  The complaint also alleges that Hidden Hemp employees were patted down. Compl. ¶ 76.  Assuming that allegation to be true for purposes of this motion, warrantless pat downs are permissible as long as they fall within the scope of the relevant administrative regulations.  *See Anobile*, 303 F.3d at 123.  Here, the alleged pat downs clearly were on their face were part of the inspections seeking nonconforming product on commercial premises.

so as to provide a constitutionally adequate substitute for a warrant under *Burger*, both in terms of having the "properly defined scope" and "limit [to] the discretion of the inspecting officers." 482 U.S. at 703.

Cannabis Law §§ 11(3) and 11(5) authorize inspections for unlicensed and licensed businesses respectively. Regulatory inspections may only occur at the "place of business" of the vendor. *Id. See also* 9 NYCRR 114.11(f) ("The office may inspect any retail location offering cannabinoid hemp products."). The Cannabis Law and implementing regulations also specifically authorize the seizure of nonconforming products. *Supra* at 6-7.

Implementing regulations dating to 2022 further delineated the scope of inspections by explicitly listing the sorts of records that can be inspected, explaining that the inspection "may include interviews of individuals," with examples then given, and providing procedures both to send products for testing and setting out seizure procedures for "any items containing cannabis or cannabis products which are in violation of the Cannabis Law or its applicable regulations," 9 NYCRR 133.3 (effective Nov. 22, 2022). Those regulations have now been amended to explicitly state that the same seizure procedures also apply to cannabinoid hemp. 9 NYCRR 133.3(i).

Such a regulatory regime permitting inspection of commercial establishments in order to ensure compliance with that scheme is squarely within this prong of *Burger*. *See, e.g.*, *Anobile*, 303 F.3d at 118 ("Because the enabling statute authorized the Board's regulations and because the plaintiffs concede that the regulations authorize the search, the plaintiffs' challenge to the scheme under which the search was conducted must fail."); *Players, Inc.* 371 F Supp. 2d at 539 ("The City's health inspection ordinances and regulations fully satisfy this [third] condition [of *Burger*] by making clear that food service establishments' receipt of a City license is granted subject to the licensees' agreement to submit to frequent inspections that will secure their compliance with public health-related laws."); *United States v. 4,432 Mastercases of Cigarettes, More Or Less*, 448 F.3d 1168, 1180 (9th Cir. 2006) ("Although the FTZ

regulations place few limits on the discretion of searching officers, we are confident that they are sufficient" because of restrictions on what businesses and items were subject to search).

Because Defendants' regulatory and inspection regime easily satisfies the four elements of *Burger,* the challenged inspections and seizures are valid under the Fourth Amendment, and Plaintiffs claims must fail.[30]

### E.  Any Due Process Claim Relating to the Inspections Fail

While Plaintiffs' complaint does not appear to assert a procedural due process violation relating to the non-return of their property, *see* Compl. ¶¶ 186, 195 (the only references to "procedural due process"), Plaintiffs insisted at oral argument that they were alleging such a violation. *See, e.g.*, Tr. 16:17-20.  Even if properly asserted, that claim would fail.  The property that Plaintiffs allege was seized are cannabinoid hemp products.  Even accepting as true Plaintiffs' allegations that OCM seized property that was legal under applicable law and regulations,[31] it is clear even from the allegations of the Complaint that Defendants seized items believed to be at least potentially *per se* contraband. *See, e.g.*, Compl. ¶ 82.[32]

---

[30] While Plaintiffs also complain about the failure to return seized products, "where, as in this case, an initial seizure of property was reasonable, defendants' failure to return the items does not, by itself, state a separate Fourth Amendment claim of unreasonable seizure." *Shaul v. Cherry Valley-Springfield Cent. Sch. Dist.*, 363 F.3d 177, 187 (2d Cir. 2004); *accord Malapanis v. Regan*, 335 F. Supp. 2d 285, 291–93 (D. Conn. 2004), *aff'd*, 147 F. App'x 219 (2d Cir. 2005). Plaintiffs' belated due process challenge regarding the retention of those items is discussed below.

[31] It must be noted that some of Plaintiffs' allegations concerning the seizures are not plausible, for example, the claim that OCM illegally seized products complaining delta-8 THC despite the fact that those products clearly do not constitute "hemp" under Federal Law and would be illegal to sell under OCM regulations. *See supra* at 11-12. However, Defendants accept as true for purposes of this motion that OCM employees incorrectly failed to return items they should have realized, post-seizure, that Plaintiffs were in fact entitled to possess. Accordingly, Defendants are not arguing at the motion to dismiss stage that Plaintiffs had no property interest at all in the seized items. *See, e.g.*, *United States v. Maggio*, 51 F.2d 397, 399 (W.D.N.Y. 1931) ("Alcohol fit for beverage purposes, possessed, except as permitted by the National Prohibition Act, is contraband, and in such no person can have property rights."); *Conservation Force v. Salazar*, 677 F. Supp. 2d 1203, 1210 (N.D. Cal. 2009), ("[P]er se contraband may be summarily forfeited without any due process protections."), *aff'd*, 646 F.3d 1240 (9th Cir. 2011).

[32] Although a different analysis applies when items that are not themselves *per se* illegal are seized pursuant to civil forfeiture statutes (*e.g.*, cars or money), in which case there is a requirement to affirmatively provide a post-deprivation hearing, *see Culley v. Marshall*, 144 S. Ct. 1142, 1148 (2024), that is not what Plaintiffs are alleging occurred here. Plaintiffs do not allege, for example, that money or vehicles were seized. *See Grant*, 2017 WL 1229737 at *4 n. 4 (distinguishing the then-current Second Circuit caselaw (which has been superseded by *Culley*) regarding seizure of cars, as inapplicable to the seizure of items defendants believed plaintiff had no right to possess (in that case mistreated animals)).

New York provides a legal pathway, CPLR Article 78, pursuant to which a court may determine *inter alia* whether the seized property was in fact contraband. *See Moss v. Spitzer*, 19 A.D.3d 599, 600 (N.Y. App. Div. 2d Dep't 2005) ("A CPLR article 78 proceeding will properly lie to require the return of property, other than contraband, seized pursuant to a search warrant and held for an unreasonable length of time without the commencement of a criminal action.*"*); *Khoshneviss v. Prop. Clerk of New York City Police Dep't*, 123 A.D.3d 929, 929 (N.Y. App. Div. 2d Dep't 2014) (denying relief under Article 78 because "the firearm and accompanying magazine clip that were seized from the petitioner's possession were contraband, and he was not entitled to their return").

The availability of a CPLR Article 78 post-deprivation remedy is sufficient to satisfy due process for this category of property. As this Court has previously held, in a case involving an assertion that defendants had violated their due process rights by failing to return their property seized pursuant to a valid search: "Case law in this Circuit has uniformly held that an Article 78 proceeding is an adequate post-deprivation procedure, and its availability precludes a plaintiff from stating a claim for a procedural due process violation." *Grant v. Am. Soc'y for the Prevention of Cruelty to Animals*, No. 16 CIV. 2765 (ER), 2017 WL 1229737, at *5 (S.D.N.Y. Mar. 31, 2017) (Ramos, J.); *see also Hourihan v. Lafferty*, 58 F. Supp. 2d 10, 15 (N.D.N.Y. 1999) (similar); *cf. Leyland v. Edwards*, 797 F. Supp. 2d 7, 10 (D.D.C. 2011) (noting, in declining to create *Bivens* remedy for failure to return seized firearms and property following criminal trial, that criminal rule allowing plaintiff to seek return of that property "avoids any constitutional deprivation").[33]

To the extent Plaintiffs are alleging that their rights were violated because OCM employees

---

[33] While *Grant* noted that the property in that case had been seized pursuant to a valid warrant, the Court, in doing so, cited to caselaw standing for the proposition that the necessity for surprise renders it impossible to provide for pre-deprivation process in the context of a valid Fourth Amendment search. *Id.* at *4 (citing *Perkins v. City of W. Covina*, 113 F.3d 1004, 1010 (9th Cir. 1997), *rev'd on other grounds*, 525 U.S. 234 (1999), *and opinion withdrawn in part sub nom. Perkins ex rel. Perkins v. City of W. Covina*, 167 F.3d 1286 (9th Cir. 1999) (subsequent history contained in *Grant*). Those same considerations also apply here, in the context of a regulatory inspection.

improperly retained property they affirmatively knew not to be contraband, their claim also fails due to the presence of post-deprivation CPLR Article 78 remedies. In instances where property was allegedly taken either intentionally or negligently in contravention of applicable rules, and is thus a "random, unauthorized act by a state employee, rather than by an established state procedure," due process is satisfied whenever "adequate state post-deprivation remedies are available." *Hudson v. Palmer*, 468 U.S. 517, 532-34 (1984) (no due process violation for seizure of prisoner's property because "the Commonwealth of Virginia provides respondent an adequate postdeprivation remedy").

Accordingly, in circumstances alleging negligent or intentional retention of property following a valid Fourth Amendment search, due process is satisfied where there are adequate post-deprivation state remedies. *Malapanis v. Regan*, 335 F. Supp. 2d 285, 292 & n. 7; (citing *inter alia Hudson*, 468 U.S. at 533).

Here, state policy mandates return of seized property that is not *per se* contraband when it is not otherwise needed for an investigation or proceeding. 9 NYCRR 133.3(i)(4) ("[U]pon determination that the detention of the items seized are no longer necessary to ensure compliance with applicable regulations, the licensee shall be notified of that determination and the items may be returned to the licensee.").[34] At most, then, Plaintiffs are alleging that OCM employees either intentionally or negligently failed to return items that were not actually contraband, doing so unauthorized by applicable law. The existence of a post-deprivation Article 78 proceeding, therefore, is sufficient to satisfy due process. *See, e.g., Vartholomeou v. City of New York*, No. 15 CV 4996 (PKC)(LB), 2018 WL 11466965, at *7 (E.D.N.Y. Jan. 2, 2018) ("As to the property that was allegedly not vouchered or returned, she fails to allege any facts suggesting that any confiscation of property

---

[34] In the case of items that are not actual *per se* contraband, retention in the absence of an expected or ongoing proceeding would not be "necessary to ensure compliance with applicable regulations" and return would thus be required under 9 NYCRR 133.3(i)(4). While the procedures in question, originally promulgated at 9 NYCRR 133.3(f), at first explicitly discussed only cannabis, the Complaint makes clear that this provision was also followed for cannabinoid hemp. *See, e.g.,* Compl. ¶ 82 ("Defendants provided Mr. Kampf an inventory list of the seized products.").

was other than random and unauthorized. . . . As New York provides adequate post-deprivation remedies for the random and unauthorized confiscation of property, defendants' motion for summary judgment should be granted on plaintiff's due process claim.") (internal citations and quotation marks omitted); *Miller v. Bazan*, No. 5:13-CV-00993 BKS, 2015 WL 339533, at *4 (N.D.N.Y. Jan. 26, 2015) (rejecting due process claim regarding seized property citing, *inter alia*, *Hudson* and stating: "New York's remedy for the recovery of property taken during a police search is an Article 78 proceeding, through which an individual can appeal the action of a state official or agency"); *see also Malpanis*, 335 F. Supp. 2d at 292 (similar holding for Connecticut procedures).[35]

If the Court entertains Plaintiffs' unpled due process claims relating to the post-inspection seizures, they must be dismissed.

### F.  Plaintiffs' Selective Enforcement Claim Fails

Plaintiffs' complaint contains three stray references to alleged selective enforcement within their Fourth and Fifth Amendment claims.  Compl. ¶¶ 162, 173, 184.  A selective enforcement claim is properly pled as a form of Fourteenth Amendment Equal Protection claim, but even assuming Plaintiffs' claim utilized the correct cause of action, it would fail.

Where, as here, a plaintiff's allegations are not based on membership in a protected class, to punish plaintiffs for exercising a constitutional right, or a plausible allegation of a malicious or bad faith intent to injure, a plaintiff must meet the standard for a "class of one" Equal Protection claim. *See generally Hu v. City of N.Y.*, 927 F.3d 81, 102 (2d Cir. 2019) (explaining and clarifying difference between classic selective enforcement and "class of one" claims); *Witt v. Vill. of Mamaroneck*, No. 12-

---

[35] *See also Grullon v. Reid*, No. 97 CIV. 7616 (RWS), 1999 WL 436457, at *9-*10 (S.D.N.Y. June 24, 1999) (dismissing "allegation of improperly seized property" because plaintiff "has an adequate post-deprivation remedy in state court, and thus has no due process claim. . . . Once all criminal proceedings involving confiscated property have terminated and a demand for the property has been made, a property clerk must turn over to a claimant any such property that is not 'per se contraband.' . . . Because an individual seeking to retrieve his property has recourse to state court remedies, there is no due process violation, and therefore no viable § 1983 claim.") (quoting *Lipscomb v. Property Clerk*, 592 N.Y.S.2d 96 (3d Dep't 1992)), *aff'd sub nom. Grullon v. United States*, 22 F. App'x 70 (2d Cir. 2001).

CV-8778 ER, 2015 WL 1427206, at *8 (S.D.N.Y. Mar. 27, 2015) (Ramos, J.) (rejecting selective enforcement claim for *inter alia* failure to plausibly plead a malicious or bad faith intent to injure plaintiffs and proceeding to consider "class of one" claim), *aff'd*, 639 Fed. App'x 44 (2d Cir. 2016).[36] To prevail on a "class of one" claim Plaintiffs must show that:

> (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake.

*NRP Holdings LLC v. City of Buffalo*, 916 F.3d 177, 198 (2d Cir. 2019) (quotation marks omitted). Even where a complaint explicitly identifies others who were treated differently from plaintiffs, the complaint must be dismissed if it fails to plausibly allege that the other entities were "so similar that no rational person could see them as different." *See Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59-60 (2d Cir. 2010) (dismissing complaint alleging selective rejection of applications regarding plaintiffs' property because the alleged comparator properties were not plausibly alleged to be sufficiently similar to plaintiffs' property).

Here, Plaintiffs have not even attempted to meet either prong of the "class of one" test. On the contrary, Plaintiffs "identif[y] no other individual at all to whom [they] may be compared. [Their] naked assertions of discrimination, absent any factual allegations regarding [their] own treatment in comparison to the treatment of other similarly situated individuals, are insufficient to support the claim." *Dava v. City of N.Y.*, No. 1:15-CV-08575 (ALC), 2016 WL 4532203, at *7 (S.D.N.Y. Aug. 29, 2016) (dismissing complaint on 12(b)(6) motion). Even under the slightly less demanding standard for a more conventional selective enforcement claim, the failure to identify such comparators is fatal. *New Page at 63 Main, LLC v. Inc. Vill. of Sag Harbor*, No. 15-CV-2433 (ADS) (AKT), 2016 WL 8653493,

---

[36] *See also Lilakos v. N.Y. City*, 808 F. App'x 4, 8 (2d Cir. 2020) ("Because the complaint is devoid of any facts suggesting malice, the district court correctly dismissed Plaintiffs' equal protection claim based on selective enforcement.")

at *21 (E.D.N.Y. Mar. 19, 2016).  Accordingly, Plaintiffs have failed to state a selective enforcement claim.

### G.  Plaintiffs' Conspiracy Claims Fail

Because Plaintiffs cannot prevail on their underlying claims, their conspiracy claim must also fail, as deprivation "of equal protection of the laws, or of equal privileges and immunities under the laws" is a core component of any § 1985 conspiracy claim (which is the cause of action Plaintiffs should have utilized).  *Mian v. Donaldson, Lufkin & Jenrette Securities Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993).  And further, an alleged conspiracy must be motivated by a racial or class-based invidious discriminatory purpose. *See id.*  Plaintiffs make no such allegation.

### CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court dismiss the Plaintiffs' complaint in its entirety and such other and further relief the Court deems just and proper.

Dated:  New York, New York
       June 20, 2024

                                      LETITIA JAMES
                                      Attorney General
                                      State of New York
                                      Attorney for Defendants
                                      By:

                                      /s Noam Lerer
                                      Noam Lerer
                                      Assistant Attorney General
                                      28 Liberty Street
                                      New York, NY 10005
                                      (212) 416-8508
                                      Noam.Lerer@ag.ny.gov